LAPOINTE MACHINE TOOL COMPANY, In Equity,

*vs.*

J. N. LAPOINTE COMPANY.

Cumberland.    Opinion December 18, 1916.

*Fair and unfair competition defined.  Use of Trade Name.  Use of Family Name.  Trade device.  Right to use family name if same has been previously transferred.  Transfer of good will.  Dealing in articles easily subject of mistake by imitation or mis-branding as compared with dealing in valu-able machinery, or piece of machinery purchased by mechanical experts.*

In a bill in equity brought to enjoin the defendant from using the name "Lapointe" in any way in connection with its corporate name or its products, and also to recover damages for loss of profits on the ground of unfair competition;

*Held;*

1. This case does not involve in any degree the question of trade marks nor the rights which pertain to patented articles.  The sole issue is that of unfair competition.

2. As the injunction sought in this class of cases operates as restraint in the mercantile field it is a principle of equity based upon caution that to justify an injunction the case must be unmistakably clear and the proof full and convincing.

3. Competition in trade is of two kinds, fair and unfair; and unfair com-petition may be subdivided into the ethically unfair and the legally unfair.  Courts have to do only with the latter.  Many acts between keen business rivals which might offend the golden rule do not violate the legal rule.

4. Unfair competition consists in beguiling or attempting to beguile the purchasing public into purchasing the wares of the offender under the belief that they are buying the wares of a rival.  The essence of the action is fraud and the prohibition is confined to cases where the wrongdoer has resorted to some form of deception.  The plaintiff must prove a fraudulent intent to deceive or show facts or circumstances from which such an intent can be reasonably inferred.

5. If the defendant, although a sharp and vigorous competitor, so conducts its business as not to palm off its own products as those of the plaintiff, the action fails. It has kept within its legal rights.

6. The question of unfair competition is one of fact, to be determined by the evidence and circumstances in each particular case, considered in the light of certain well defined rules of law.

7. Some of the complaints, such as the motive of Lapointe in leaving the old company, the hiring of many of its employees, and the change in cable address, are of minor importance and, if proved, fall within the domain of the unethical rather than the unfair. But the evidence fails to substantiate the significance claimed for them.

8. In the absence of contract, estoppel or fraud, any person can use his own name in all legitimate ways and either as a part or the whole of a corporate name.

9. No contract right to the exclusive use of the name "Lapointe" existed in the plaintiff, and the record does not show such conduct on the part of either Lapointe or the defendant as will warrant with the application of the doctrine of equitable estoppel.

10. While family names sometimes acquire a secondary meaning and come to denote not merely origin but quality, the acquisition of such a secondary meaning is a matter of proof and the proof here is lacking. Lapointe had come to stand for a certain type of machine, but was not a brand or trade name.

11. As the originator of this particular process, Lapointe had the right to avail himself of his reputation and to use his name in the new corporation provided he exercised care to prevent the public from believing that his product, or the product of the new company, was the product of the old, or that the new company was the successor of the old.

12. The machines themselves, although somewhat similar in outline and appearance, especially to the inexperienced layman, possess points of marked difference to the expert mechanic. They are marked with no special device, but with the name and residence of the maker. The partial dissimilarity in name and the entire dissimilarity in residence should tend to prevent confusion in the minds of purchasers.

13. The defendant by its letters, circulars, advertisements and oral representations made all reasonable effort to acquaint the trade with the situation, and to differentiate between the two companies and their products. It obviously desired to avoid and not to create confusion, and it claimed superiority for its own machine over those of the plaintiff.

14. The test on the question of similarity is the likelihood of deceiving an ordinary purchaser who is exercising ordinary care. In applying the test regard must be had to the nature and physical requirements of the article itself, its cost, the class of persons who purchase it and the circumstances under which it is purchased.

15. These machines are not sold like articles of merchandise in common use which are sold through middlemen to the general and undiscriminating public, but either directly or through sales agents to a limited and specialized trade composed of mechanical experts who are not apt to purchase without careful investigation and examination.

16. The evidence fails to prove that the defendant either succeeded in palming off its product as the product of the plaintiff, or attempted to do so. The defendant belongs in the class of legitimate and not unfair competitors.

Bill in equity brought by plaintiff company against the defendant, both organized under the laws of the State of Maine, alleging, among other things, unfair competition on the part of the defendant and asking the court to enjoin the defendant company from using the name "Lapointe" in any way connected with its business, and also asking for damages on account of loss of trade and profits therefrom. Temporary injunction granted by single Justice. Questions of law having arisen of sufficient importance and doubt to justify the same, and the parties agreeing thereto, case was reported to the Law Court for decision upon bill, answer, replication and evidence, including original exhibits produced in court. Upon so much of the evidence as legally admissible, the Law Court is to render such judgment as the rights of the parties, legal and equitable, shall require. If the Law Court shall find for the complainant, this case is to come back for determination by a master of the damages and profits. Temporary injunction dissolved and bill dismissed with costs. Decree in accordance with opinion.

Case stated in opinion.

*James A. Tirrell, of Boston, Mass., and Woodman & Whitehouse,* for plaintiff.

*Philip Z. Hankey, of New London, Conn., and Williamson, Burleigh & McLean,* for defendant.

Sitting: Savage, C. J., Cornish, King, Bird, Haley, Philbrook, JJ.

Cornish, J. This bill in equity is brought by the Lapointe Machine Tool Company of Hudson, Massachusetts, against the J. N. Lapointe Company of New London, Connecticut, both corporations having been organized under the laws of this State, to enjoin

the defendant from using the name "Lapointe" in any way in connection with its corporate name or its products, and also asking for damages for loss of profits.  The cause is before this court on report, a temporary injunction having been issued by the sitting Justice.  The essential facts may be outlined as follows:

Both the plaintiff and defendant companies are manufacturers of what is known in the mechanic arts as broaching tools and broaching machines.  A broaching tool, or a broach, as it is sometimes called, is made from a solid bar of steel in which teeth are cut, each succeeding tooth being a little longer than the preceding.  A broaching machine is operated by either pushing or pulling a broach through an internal section of metal changing its contour or outline.  The cutting of a key way is a simple illustration.  Broaching tools and machines of various designs have been known to the trade for many years.

In 1896 Joseph N. Lapointe, then an employe of the Pratt and Whitney Company of Hartford, Connecticut, after many experiments originated a system of broaching which was a marked improvement on the methods then in use.  This improvement in the broaching tool consisted in making the cutter teeth an integral part of the bar instead of having separate teeth attached to the bar.  He also designed and built a broaching machine of a new model adapted to do the work by this new system.  Some of the older machines then in use were upright.  The Crompton and Knowles type which he had been using in the Pratt and Whitney shop was of the horizontal type but with a rack and pinion drive.  The machine originated by Lapointe was also of the horizontal type but with a nut and screw drive.  This increased the power, and the new system combining both the machine and the improved tools enhanced the production and enlarged the scope of the work.

On March 3, 1902, J. N. Lapointe caused the plaintiff company to be incorporated for the purpose of manufacturing among other products these new broaching machines and broaches.  He gave to it the name of the Lapointe Machine Tool Company.  On March 15, 1902, he conveyed to the corporation all his patent rights, whether issued or pending, and all his right, title and interest in his patterns, drawings and designs in return for stock in the company.  He himself became a director and the president and general

manager. He was the head of both the manufacturing and the business departments and was the ruling spirit in the company.

This corporation began business in a small way on Hereford street, Boston, Mass., with only three or four employes. As it had meagre capital, it, at first, did a general jobbing business and, later, manufactured portable reamers and taps. At the end of eighteen months larger quarters were secured on Atlantic avenue. In 1903 it manufactured and sold its first broaching machine. In 1906 the company moved to Hudson, Mass., where it erected a plant and has ever since remained. Its trade increased after the removal to Hudson and with the advent and development of the automobile business, beginning about 1900, the use of these machines was multiplied. Frank J. Lapointe, the plaintiff's son, early entered into the service of the company. He was made a foreman and later had practically one-half of the manufacturing at the Hudson plant under his charge. He was a skilled machinist.

In the summer of 1911, one Hall, who had been a stockholder and the treasurer for several years, but who was himself actively engaged in the insurance business in Boston, acquired the stock control of the corporation. Friction ensued and both J. N. and Frank J. Lapointe were, as they claimed, practically forced out of the company.

On July 17, 1911, immediately after severing his connection, J. N. Lapointe organized the defendant corporation, gave it his full name and began the manufacture of broaching machines and tools at Marlboro, Mass. The company remained there about eighteen months and in the early part of 1913 moved to New London, Connecticut, where a new plant had been constructed and where it has ever since been carrying on a growing business. Frank J. Lapointe entered the new concern with his father. Another son, Ralph R. Lapointe, was engaged by the plaintiff as a mechanical engineer after the withdrawal of his father and brother and is still in its employ.

This brief statement of facts makes an adequate outline for the discussion of the issues in this case. The plaintiff and defendant have been engaged in lively competition since 1912 when the new company started in active business. The plaintiff contends that this competition has been unfair on the part of the defendant, and

on December 11, 1915, brought this bill in equity to protect its rights by enjoining the defendant from the use of the name "Lapointe," and to recover damages for loss of profits. The decision of this case does not involve in any degree the question of trade marks nor the rights which pertain to patented articles. The sole issue, around which all the subsidiary and collateral issues cluster, is that of unfair competition. This is a question of fact to be determined in accordance with certain well recognized and clearly defined rules of law.

It should be stated at the outset that the nature of this form of action is such that the courts require clear and convincing proof of the plaintiff's claim. In a sense the remedy that is sought invades the realm of private enterprise and private rights, and it is only when the necessity and the justice of such invasion are made clear that the court in equity will interfere. As was said by the Federal Court, in denying an injunction in a very recent case:

"When a plaintiff provisionally stands upon grounds independent of the scope of his patent and goes to the proposition of unfair competition in trade, he prevails, if he prevails at all, under the general doctrines of equity; and when an injunction is sought, which operates as restraint in the mercantile field, it is a principle of equity based upon considerations of caution, that to justify an injunction the case must be unmistakably clear and beyond question." *Marshall Field & Co. v. Kelley Co.,* 233 Fed., 265 (1916).

Stated broadly, monopoly in trade is frowned upon, while free competition is favored by the law. There is, of course, one exception to this rule, namely patent and copyright legislation which is designed to promote invention and literary achievement. But unless a commodity is governed by these exceptional rights competition is to be desired and encouraged.

Competition, however, is of two kinds, fair and unfair, and unfair competition may be subdivided into the ethically unfair and the legally unfair. Courts have to do only with the last named. Many acts among keen business rivals which might offend the golden rule do not violate the legal rule.

Hence it is that unfair competition, as a legal term, has acquired a well defined meaning. Its definition is found in varied forms

throughout the decisions, several of which are collated in Nims on Unfair Business Competition, sec. 14; but the underlying element in all is that no person shall be permitted to palm off his own goods or products as the goods or products of another.  The essence of the wrong consists in beguiling or attempting to beguile the purchasing public into buying the wares of the offender under the belief that they are purchasing the wares of a rival.  The ground of the action is fraud.  The prohibition is confined to cases where the wrongdoer has resorted to some form of deception.  The complaining party must prove such circumstances "as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of."  *W. R. Lynn Shoe Co.* v. *The Auburn-Lynn Shoe Co.,* 100 Maine, 461, 476, quoting the rule adopted by the Supreme Court of the United States in *Elgin Nat. Watch Co.* v. *Illinois Watch Co.,* 179 U. S., 674.

The methods adopted to practice this deception are as varied as human ingenuity can devise.  It may be by closely simulating a particular device, mark or symbol, by assuming the same or practically the same name, by the use of crafty and misleading advertisements or by false oral representations.  Such conduct, calculated to steal away the custom, good will and business established and maintained by another, works both a fraud upon the purchasing public and actionable injury upon the defenceless rival.  The rights of both are to be protected.  Nims, sec. 16-20; *C. A. Briggs Co.* v. *National Wafer Co.,* 215 Mass., 100; *W. R. Lynn Shoe Co.* v. *The Auburn-Lynn Shoe Co.,* supra.

The converse is also true.  If the defendant, although a sharp and vigorous competitor, so conducts his business as not to palm off his products as those of the plaintiff, the action fails.  He has kept within his legal rights.  *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict,* 198 U. S., 118; *Motor Mfg. Co.* v. *Marshalltown Mfg. Co.,* 167 Iowa, 202, 149 N. W., 184; *Kaufman* v. *Kaufman,* 223 Mass., 104.

On which side of the line stands the defendant here?  Is it a fair or an unfair competitor?  This is a question of fact, and the answer must be found in the record.  Its determination brings us to a consideration of the evidence and to the facts and circumstances relied upon by the plaintiff as proving unfair competition.

Some of these complaints are of a minor nature and even if substantiated they fall within the domain of the unethical rather than of the legally unfair.   They are urged by the plaintiff as revealing an actual willful intent to defraud on the part of the defendant.

The plaintiff in the first place contends that J. N. Lapointe and his son Frank were not forced from the old company, but voluntarily withdrew because they were incited by its large and growing business to establish a rival concern of their own.   The facts do not bear out this contention.   It is proven to the satisfaction of the court, that after Hall had acquired the stock control and friction had developed, in an interview between J. N. Lapointe and Hall, the former offered to purchase Hall's stock at par, amounting to $11,000, although its cost was much less, and continue the business, or to sell his own stock at seventy-five cents on the dollar and agree not to engage in the same kind of business again.   Hall declined both offers.   He would neither sell nor buy, and Lapointe then added: "Well, then it is a question of competition."   We can see in this situation neither ground of complaint on Hall's part nor evidence of bad faith on the part of Lapointe.   Whether the ill feeling that had been engendered between the business head and the controlling owner was adequate cause for Lapointe's withdrawal is immaterial.   It seemed adequate to Lapointe, and his statement as to competition was frank and plain.   Deception does not show its hand so openly.

The plaintiff further claims that in order to injure the plaintiff's business by causing it to make errors in filling duplicate orders, Frank J. Lapointe, just before leaving the employ of the old company, fraudulently altered the company's shop sketches.   This is a serious charge.   It involves rank turpitude on the part of the offender and needs convincing proof.   Frank J. Lapointe indignantly refutes the charge.   Without discussing the evidence on this point in detail it is sufficient to say that the imputation is without substantial basis.   The claim outstrips the facts.

Another complaint made by the plaintiff is that the defendant took away many of its skilled workmen in order to handicap the plaintiff's business and enable the defendant by plausible adver-

tisements to create the impression that it and not the plaintiff was the concern of long standing. It is true that several of the employes of the old company followed Mr. Lapointe into the new, but the change was voluntarily made. In most cases they sought the new employment because they wished to work under their old manager, a most natural and reasonable course on their part. The defendant advertised for help in the Hudson newspapers as it had a legal right to do. Some of the old employes answered the advertisement as they had a legal right to do. Competition in the employment of labor is full and free.

The fourth minor complaint is that Lapointe after conferences with the representatives of the telegraph company took for the new company the cable address "Lapointe-Marlboro," leaving for the old company, "Lapointe-Hudson." This does not smack of fraud. Lapointe naturally wished to incorporate his own name in the new cable address. The difference in the residence obviated any confusion, especially as the foreign business was done through sales agents who were not likely to be misled.

It is unnecessary to devote more space to minor and rather insignificant contentions. We come now to the more serious elements of the plaintiff's cause, those growing out of the name taken by the new company and the alleged fraudulent methods adopted by it, by way of advertisements and otherwise, to deceive the public and injure the plaintiff.

The name of the original corporation is the "Lapointe Machine Tool Co.," the name of the new is the "J. N. Lapointe Co." Has the adoption of that name by the defendant subjected it to the charge of unfair competition? The decisive test is whether by the use of the word "Lapointe" in its corporate name the defendant is sailing under false colors and is succeeding in palming off its machines as the machines of the plaintiff. The use of the name itself is not controlling. The manner in which it is used and the actual or probable effect are the vital questions. The gist of the action is not the employment of similar words, but the appropriation of the plaintiff's business. Thus it has been very recently decided by the Massachusetts court that the mere use of a trade name which one person has found effective in bringing his

goods to the attention of the public in one business territory, by another person in another business territory constitutes no actionable wrong.   *Kaufman* v. *Kaufman*, 223 Mass., 104.

A distinction should here be noted between the use of a family name as a trade name and certain trade marks, designs or devices. The latter are arbitrary symbols adopted to designate particular goods.   They are associated with those goods and no others, and rivals are not permitted to imitate them.   The device in *W. R. Lynn Shoe Co.* v. *Auburn-Lynn Shoe Co.*, 100 Maine, 461, is a fair illustration.   But the use of a family name is quite different, and to prohibit its use throws upon the complaining party the burden of showing the deceitful practices which are the gist of unfair competition.   Nims, sec. 81.

Moreover a trade name, if it be not fanciful, gives more information than a trade device.   It often gives not merely the name, individual or corporate, of the manufacturer, but the place of manufacture as well; while a trade device or a fanciful name is silent on these points and can give this information only by association.

These observations are pertinent here.   It is conceded that J. N. Lapointe was the originator of this particular process and was a widely known and acknowledged expert in the art of broaching. Hence he naturally wished to avail himself of the general reputation in the trade which attached to that business, and he had a perfect right to do this provided he exercised care to prevent the public from believing that his product, or the product of the new company employing his name, was that of the old company, or that the second company was the successor of the first.   *Int. Silver Co.* v. *Rogers*, 66 N. J. Eq., 119; *Stix Baer & Fuller Co.* v. *American Piano Co.*, 211 Fed., 274; *Knabe Bros.* v. *American Piano Co.*, 229 Fed., 23; *Hotel Claredge Co.* v. *Rector*, 169 App. Div., 185, 149 N. Y. Supp., 748; *Wm. Rogers Mfg. Co.* v. *Simpson, et als.*, 54 Conn., 527.

"Every person has a right to the honest use of his own name in his own business, but he will not be permitted by imitation and unfair devices to mislead the public in regard to the identity of the firm or corporation or the goods manufactured by it."   *W. R. Lynn Shoe Co.* v. *Auburn-Lynn Shoe Co.*, 100 Maine, 461-473.

If the use of the name be reasonable, honest and a fair exercise of his right, the user is not rendered liable for the incidental damage caused a rival thereby. The inconvenience or loss is damnum absque injuria. The injury which results from similarity in name alone is not actionable. But the offender cannot resort to any artifice or adopt any methods calculated to deceive the purchasing public. This is settled law. *Brown Chemical Co. v. Meyer,* 139 U. S., 540; *Singer Mfg. Co. v. June Mfg. Co.,* 163 U. S., 169; *Elgin Nat'l Watch Co. v. Illinois Watch Co.,* 179 U. S., 665; *Howe Scale Co. v. Wyckoff, Seamans & Benedict,* 198 U. S., 118. In the case last cited, the court laid down the rule that in the absence of contract, fraud or estoppel, any person could use his own name in all legitimate ways and as a part or the whole of a corporate name. This rule can be applied here. No contract right to the use of the name "Lapointe" exists in the plaintiff. True, J. N. Lapointe allowed his surname to be used as a part of its corporate name when it was organized, and that privilege he has not attempted to and cannot take away although he has severed his connection with the company. But it is not an exclusive right. He conveyed to the company his patents, drawings and designs. He did not relinquish the exclusive right to use his name nor did he transfer his good will. Had his name been sold he could not use it in the second corporation. *Russia Cement Co. v. Le Page,* 147 Mass., 206; *Frazier v. Lubricator Co.,* 121 Ill., 147, 13 N. E., 637; *Symonds v. Jones,* 82 Maine, 302; *Kidd v. Johnson,* 100 U. S., 617. But as neither the use of his name as a trade name nor his good will was transferred, no contract right therein belongs to the plaintiff. *Hezelton Boiler Co. v. Hezelton Tripod Boiler Co.,* 142 Ill., 494, 30 N. E., 339.

Nor is there proof of conduct on the part of Lapointe such as to create an equitable estoppel. This claim is urged by the learned counsel for the plaintiff, but the record fails to disclose acts which will warrant the application of that doctrine. The cases cited to support the contention are based upon facts vitally dissimilar from those that confront us here. They are readily to be distinguished.

This eliminates all but the third restriction upon the use of one's name as held in *Howe Scale Co. v. Wyckoff etc.,* supra, and that

is the presence of fraud.   We are back again then upon the original proposition that fraud is the essence of this proceeding and that it is the deceiving use of the name and not the use itself which compels relief.

What then is the character of the use which the defendant has made of the word "Lapointe"?  Was it chosen as a cover for unfair competition?  Has it been used craftily, with the purpose of misleading the purchasing public, and has the wrongful design been accomplished?  In the judgment of the court these questions must all be answered in the negative and for the following reasons:

In the first place the name selected, while it contained the surname of the originator of the process, did not copy it closely. There is a marked difference between the "Lapointe Machine Tool Co." and the "J. N. Lapointe Co."  The new name did not so much imitate the old as it emphasized the personal association of its owner with the new.

In the second place the broaching machines themselves are marked with no special device, simply the maker's name and the residence.   On the machines of the plaintiff are the words "The Lapointe Machine Tool Co., Hudson, Mass., U. S. A.," on the machines of the defendant, "The J. N. Lapointe Co., Marlboro, Mass., U. S. A.," and after the removal "The J. N. Lapointe Co., New London, Conn., U. S. A."   The partial dissimilarity in name and the entire dissimilarity in residence should tend to prevent confusion in the minds of the trade.   The place of business of rival concerns, whether in the same or different towns, is always a point to be considered. *Holmes, Booth & Hayden* v. *Holmes, Booth & Atwood,* 37 Conn., 278; *Viano* v. *Baccigalupo,* 183 Mass., 160; *W. R. Lynn Shoe Co.* v. *Auburn-Lynn Shoe Co.,* 100 Maine, 461.

Moreover the machines themselves though somewhat similar in outlines and appearance, especially to the ordinary and inexperienced layman, possess points of marked difference to the expert mechanic, and these differences became more conspicuous as the defendant added one improvement after another.   It must not be overlooked that in the manufacture of a machine the maker is limited as to general form and design by the very nature of the article itself.   It must be adapted to a particular kind of work,

and hence must necessarily assume the form calculated to perform that work best. No intention to imitate should be inferred therefrom. It is quite different from the wide option left open to the manufacturer of commodities which are designated by labels, or wrappers, or form of package. Here there is no excuse for imitation, as in packages of chocolate, *Baker* v. *Slack,* 130 Fed., 514, or velvet candy, *Hildreth* v. *McDonald Co.,* 164 Mass., 16, or shoes, *W. R. Lynn Shoe Co.* v. *Auburn-Lynn Shoe Co.,* supra.

The plaintiff urges however that "Lapointe," although primarily a family name, has acquired a secondary meaning and has become identified with the products of the plaintiff company. That it denotes not merely origin but quality, and it cannot be used by the defendant as a corporate or trade name since that would necessarily create the impression that the defendant's products are those of the plaintiff. It is true that family names do sometimes acquire such a secondary meaning, as "Rogers Silver," *International Silver Co.* v. *Rogers Co.,* 110 Fed., 955, or "Baker's Chocolate," *Walter Baker & Co.* v. *Slack,* 130 Fed., 514. But the acquisition of such a secondary meaning is in every case a matter of proof, and the evidence here does not sustain the claim. There is no evidence that the broaches were marked at all, and the machines were not marked as "Lapointe" products, but like all heavy machines of like character with simply the name and business location of the maker. The plaintiff's advertising by catalogue or through the trade journals followed for the most part the same course. The machines came to be known in the trade simply as the type of broaches, propelled by nut and screw in a horizontal plane, made by the Lapointe Machine Tool Co., of Hudson, Mass. As one of the plaintiff's witnesses put it, the machine was known as a Lapointe broaching machine and "Lapointe" was used, not as a descriptive trade name like "Perfection Cigarettes," because, to quote his own language: "I take it that 'Perfection' is a brand or trade name, while 'Lapointe' is descriptive of a type, as between a hoist bridge and a swing bridge."

We come now to the circulars and advertisements issued by the defendant. They are of great value in ascertaining the good or bad faith and the honest or fraudulent purpose of the new com-

pany and of J. N. Lapointe as its head.  *Goodyear Mfg. Co.* v. *Goodyear Rubber Co.,* 128 U. S., 598; *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict,* 198 U. S., 118, 139.  After the Lapointes had left the old company and formed the new, the new corporation made thorough and persistent efforts to state the exact facts and acquaint the trade with the true situation.  It obviously desired to avoid confusion, not to create it; to sail under its own colors not under the colors of another, and to sell its products as its own and not as those of the rival.  Immediately after the organization of the new company it sent out postal cards to all the trade and all prospective customers, including the customers of the old company, announcing the formation of the new corporation and the establishment of its business at Marlboro, Mass., asking for patronage and adding:  "Mr. J. N. Lapointe and son Frank J. Lapointe have had nine years' experience in this line of work in their former connection with the Lapointe Machine Tool Company and are justified in considering themselves not only the pioneers but the systematizers of the broaching system as they have put it into practical use."  This was signed "The J. N. Lapointe Company, Marlboro, Mass."  This was followed by a circular letter of the same import to all manufacturers of automobiles, of automobile parts, and to many other metal working concerns and machine shops.  Agencies were established throughout the United States and J. N. Lapointe personally visited many of them as well as many automobile manufacturers throughout the central west, about three months after the business started.  He explained to all that he had severed his connection with the old company, had established the new, and proposed to make broaching machines possessing valuable improvements, and he instructed his agents to always make the same distinction.  The evidence shows that these instructions were followed.

In addition to these precautions the defendant advertised in the trade paper, "American Machinist," for six months, emphasizing in different forms the fact that J. N. and Frank J. Lapointe had left the old company and formed the new, and after the removal to New London, Conn., the trade was informed of that removal. We can hardly conceive what additional steps could have been taken by the defendant to explain to the purchasing public the

existence of two corporations and to disabuse their minds of any connection between the two. The defendant continued to advertise in the trade journals as did the plaintiff. The defendant in many advertisements stated that the Lapointes were the originators of the system. Such was the fact and the new company had the legal right to advertise it. *Fish Bros. Wagon Co.* v. *Fish,* 82 Wis., 546. A few advertisements crept in which might be somewhat objectionable if taken literally, but we think this was due not to design but rather to the inattention of the defendant in trusting too much to the publisher, and in not critically examining the phraseology before it appeared in print. As a whole the advertisements made a clear distinction between the two corporations and their respective products. In many instances the advertisements of both appear upon the same or opposite pages and this at the request of the defendant. They were the product not of a designing and deceiving imitator but of an open and confident competitor. The man of ordinary caution and discernment had no excuse for being misled thereby.

In this connection another important fact should be kept in mind. We are not dealing here with merchandise or articles in common use, which are advertised and sold to the general and indiscriminating public, like shoes, breakfast food, chocolate, soap, candy, &c., &c., articles which may easily be the subject of mistake, but we are dealing with a valuable machine, involving a substantial expenditure of money, designed for a particular work and purchased only by men who are mechanical experts and know precisely what they want and what they are buying. It is a limited and specialized trade. The customers are men with trained mechanical eye and brain who do not purchase a machine of this character and value without careful examination and consideration. These machines are not sold to middlemen, like ordinary articles of trade, but by the manufacturer to the user, either directly by the company or indirectly by its sales agents. The likelihood of palming off the defendant's machines for the plaintiff's, even if the defendant desired to do so, is very remote.

The test applied by the courts on the question of similarity is the likelihood of deceiving an ordinary purchaser who is using ordinary care, and in applying that test regard must be had to the nature

and physical requirements of the article itself, its cost, the class of persons who purchase it, and the circumstances under which it is purchased. *Fairbanks Co.* v. *Bell Mfg. Co.,* 77 Fed., 869; *Barnes Co.* v. *Vandyck Chemical Co.,* 207 Fed., 855, affirmed in Circuit Court of Appeals, 213 Fed., 637 (1914); *Wirtz* v. *Eagle Bottling Co.,* 50 N. J. Eq., 164; Nims, sec. 39, 40.

Perhaps the best test of whether certain acts are likely to deceive is whether after being continued for a series of years they have in fact deceived. The evidence here is lacking to prove that the public have been misled or that substantial confusion has been created. Through carelessness or mistake a few letters or orders or telegrams are shown to have been sent to the one concern when they were intended for the other, but the witnesses themselves admitted the error and that very fact admits also their knowledge of the existence of the two concerns. *Motor Mfg. Co.* v. *Marshalltown Mfg. Co.,* 167 Iowa, 102. Considering the volume of business transacted the confusion would seem to be negligible. One of the leading sales agents for the plaintiff, and its own witness, intelligently sums up the situation on the question of confusion. He states that competition began early in 1912, and this competition increased the difficulty of selling his own make. Customers then wished to know which was the original Lapointe broaching machine, and he explained that his was the original. But he says that "today the purchaser of this type of machine is familiar with both companies and in conversation a customer merely asks which Lapointe broaching machine I am handling."

This is undoubtedly a correct statement of the present situation. Any slight misapprehension that may have at first existed on the part of the public has ceased. It is five years since the competition started. It has been persistent and vigorous. But its very intensity on both sides has served to dispel all possible misunderstanding. The defendant apparently is proud of its product and has endeavored to impress upon the trade its superiority over the product of the rival plaintiff. It wishes to be known and is known not as the old company, nor as its successor, but as a distinct and pushing competitor.

The case of *W. R. Lynn Shoe Co.* v. *The Auburn-Lynn Shoe Co.*, 100 Maine, 451, so often referred to before, is confidently relied upon by the plaintiff in support of its various contentions. The principles of law laid down in that case so far as applicable are reaffirmed in this. But that decision depended, as in every case it must depend, upon the particular facts involved, and the court, after discussing the evidence, reached this conclusion: "The entire history of the conduct of the shoe business by the defendant corporation after the retirement of W. R. Lynn from the plaintiff company, discloses a manifest intention and persistent effort on the part of the management to beguile the old customers of the plaintiff company into purchasing the defendant's shoes under the impression that they are the Auburn-Lynn product manufactured by the plaintiff and thereby to appropriate the value of the reputation which the latter had acquired. It shows a determination to continue such efforts until compelled by the courts to forbear."

With equal truth it can be said in the case now before us that the entire history of the conduct of the machine business by the defendant corporation after the retirement of the Lapointes from the plaintiff company discloses no such fraudulent intention and no such inequitable effort as was there discovered and decried. We find in the appallingly voluminous record an entire lack of proof that the trade has been imposed upon and beguiled, or that the conduct of the defendant has been calculated to produce that result. Legitimate competition relies on the intrinsic merits of its own goods and offers to purchasers a choice of selection between the articles exposed for sale. Unfair competition seeks to appropriate the reputation of another and to dispose of its product as the product of that other. The former acts openly, though it may be with energy. The latter acts cunningly and in disguise.

It is the opinion of the court that the defendant belongs in the class of the legitimate and not the unfair competitors. The temporary injunction is therefore to be dissolved, and the bill dismissed with costs.

*Decree in accordance with the opinion.*