**PENNWALT CORPORATION, Plaintiff,**

v.

**BECTON, DICKINSON & COMPANY,
Defendant.**

**Civ. No. 77–0399.**

United States District Court,
D. New Jersey.

April 22, 1977.

Robinson, Wayne & Greenberg by Donald A. Robinson, Newark N. J., for plaintiff; Miller & Prestia by Robert Danehower, and Austin Miller, Philadelphia, Pa., of counsel.

Stryker, Tams & Dill, Newark, N. J., for defendant, by Burtis W. Horner, Newark, N. J., Kane, Dalsimer, Kane, Sullivan & Kurucz by David S. Kane, Davis H. Kane, Siegrun D. Kane, and John Boyle, New York City, of counsel.

BIUNNO, District Judge.

This is a trademark infringement and unfair competition case. Jurisdiction is grounded both on diversity of citizenship, 28 U.S.Code § 1332 and on the Lanham Act, 15 U.S.Code § 1051 et seq. This calls for consideration of both similarity of the marks used and of the other features such as trade dress.[1]

In any event, no differences between federal and state law applicable to the issues appear to exist in regard to the major controversy.

The complaint was filed February 25, 1977, with process served February 28, 1977, and the matter was scheduled for hearing on application for preliminary injunction.

However, due to an extended jury trial of a criminal case which was called on January 11, 1977—not yet completed—the Court suggested to the parties that evidence be gathered by deposition, document discovery and otherwise, which would not call for judicial time that was unavailable; and also that trial on the merits be advanced and consolidated with the hearing on the application under F.R.Civ.P. 65(a)(2).[2]

This course was followed and over a period from March 17, 1977, to March 31, 1977, deposition testimony, comprising 925 pages, was adduced from nine witnesses and more than 120 exhibits were marked.

On the afternoon of April 15, 1977, after the jury in the criminal case had been instructed, the combined hearing and trial were begun and continued daily through April 20, 1977, when arguments on both sides were completed.

---

1. See *Q–Tips v. Johnson & Johnson*, 206 F.2d 144 (CA–3, 1953), at p. 145; *Johnson & Johnson v. Colgate-Palmolive Co.*, 345 F.Supp. 1216 (D.N.J.1972).

2. This arrangement also provided for swearing each witness called at the hearing, having him authenticate his deposition testimony, and marking it as an exhibit to constitute his direct testimony. Cross-examination and redirect then followed in the courtroom. Depositions of party witnesses were also allowed to be offered by the adverse party under F.R.Civ.P. 32(c)(2). In one instance, mentioned later, the court felt a need to observe a witness whose deposition testimony was introduced, and the witness was called for supplemental testimony at the hearing. All in all, the arrangement provided means for a full and complete hearing with a minimum demand on judicial courtroom time, thus improving productivity and providing speedy and inexpensive disposition, F.R.Civ.P. 1.

Six witnesses testified at the trial, filling out and extending the materials already compiled, and a number of affidavits and exhibits were received in evidence, as well. Eight exhibits were marked at the instance of the Court and several reference works were approved by the parties as sources for judicial notice.[3]

On review of these materials, together with the briefs and arguments of counsel, the Court is satisfied that the matter is ripe for both preliminary and final adjudication except for certain collateral aspects to be noted later.[4]

Pennwalt markets a product with the mark CRUEX,[5] composed of calcium undecylenate as the active ingredient, together with talcum powder and a perfume. Perhaps a lubricant may also be included.

The product was originally marketed by William H. Singer, who sold it on mail order back in 1963. At that time he operated a sole proprietorship business as Package Services, in White Plains. The product was then sold as CRUEX, as a spray powder in a plastic bottle with the CRUEX label.

His ads were published in the New York Daily News and he received some 400 orders over about a year. A photocopy of the labeling shows that the bottle was a squeeze bottle.

In 1964 Singer sold CRUEX to Strasenberg Laboratories and turned over his customer list. He also forwarded later mail orders as received. Strasenberg Laboratories had merged with Wallace & Tiernan effective January 1, 1961, became a division of that company, and later was called W. T. S. Pharmaceutical.

In 1964 Pharmacraft was acquired from the Seagram Company and in 1969 Wallace & Tiernan merged with the Pennsalt Company to become Pennwalt, with the pharmaceutical business continuing as Pharmacraft, a division of Pennwalt.

As of 1961 Pharmacraft had been marketing two products sold as non-prescription ethical drugs, that is, to physicians rather than to consumers. One was DESENEX, an anti-fungal agent primarily offered for athlete's foot and general fungus infections; and CALDESENE, a powder to treat diaper rash in babies.

In 1961 marketing of these items as proprietary products over the counter to consumers was begun. The anti-fungal agent in DESENEX was undecylenic acid, and in CALDESENE it was calcium undecylenate.

3. Exh. C–2 consisted of (a) p. 1230 of the Physician's Desk Reference (1977), listing CRUEX and DESENEX as Pharmacraft products; (b) excerpts from the AMA "Current Medical Information and Terminology", for the entries "foot, athlete", "tinea pedis" and "tinea cruris" (no entry appeared for "jock itch"); Schmidt's Attorneys' Textbook of Medicine", p. J–3, showing no entry for "jock itch".

Exh. C–3 consisted of p. 654 of Stedman's Medical Dictionary (Williams & Wilkins, 1972) showing the use of "dhobie itch" and "jock itch" to refer to "tinea cruris".

Exh. C–4 consisted of excerpts from Dorland's Illustrated Medical Dictionary, 25th Ed. (W. B. Saunders, 1974), with p. 805 listing the same meanings as Exh. C–3, and pp. 1612–1613 listing the numerous fungal skin infections which include the term "tinea".

Exh. C–5 consisted of pp. 181–189 of "The Practitioner's Dermatology" (Dun-Donnelly, 1975), reviewing dermatoses due to fungi and including "tinea of the groin" at pp. 183–185.

Exh. C–6 consisted of Ch. 15 of Andrews' "Diseases of the Skin" 6th Ed. (W. B. Saunders, 1971), dealing with "diseases due to fungi", and discussing "tinea cruris" at pp. 331–332.

Exh. C–7 consisted of pp. 66–73 of Arndt's "Manual of Dermatologic Therapeutics" (Little, Brown, 1974) dealing with ringworm fungi infections, and including tinea cruris at p. 68.

Exh. C–8 is a set of color patch samples of inks marketed by Lewis Roberts, Inc. as the PANTONE matching system.

4. The shortness of available time, the interrupting demands of the criminal trial, i. e., to answer questions posed by the jury, and other matters required to be given priority, i. e., the command under the new Rules effective February 1, 1977, that matters arising under 28 U.S.C. §§ 2254 and 2255 be processed "promptly", obliged the court to record its findings of fact and conclusions of law under F.R.Civ.P. 52(a) in the form of this oral opinion. Footnotes were added later.

5. All product names set out in capitals in this opinion are taken as trademarks, registered trademarks, or tradenames, as the case may be.

When Singer marketed CRUEX he merely packaged the same formula as CALDESENE which then had 15% of the active ingredient. This proportion was unchanged until 1972–3 when this ingredient was reduced to 10%. The witness McGraw testified that the proportion for CRUEX was always 10 percent.

CRUEX was marketed specifically for "jock itch," *tinea cruris,* and is still so marketed. For a period it was packaged as an aerosol powder, but with the hue and cry about claims of long-term ecological damage from fluorocarbons and the risk that they might be banned, as cyclamates have been, and as saccharine may be, it has been packaged as a spray powder in a squeeze bottle for the last 18 months or so as it was when Singer sold it.[6]

National retailing of CRUEX began with test marketing in 1966 under the direction of Mark Logan, now an employee of defendant. Logan explained that market tests are used for a new product primarily to avoid a mistake at the national level so that if there were a complete market failure it would be on a small scale.

From that time on obstacles were encountered in securing advertising to emphasize the term "jock itch." The evidence shows the term is widely known and has been for many years but that its appearance in print for advertising or its use on the air for radio and TV broadcast was taboo. Its use was regarded as "not in good taste."

The reason for this is not entirely clear, as the views are doubtless reflections of subjective notions, as observed by the witness Popofsky. Inspection of entries in Webster's Third International Dictionary indicates that the squeamishness may be due to the association of the term with "jock strap," a common term for an athletic supporter, the derivation of which is given in the dictionary as employing the Scottish word for "penis".

The term "jock itch" is also in the dictionary and is denoted as synonymous with the Latin term *"tinea cruris,"* and the definition indicates that it is a fungus infection of the groin.

References to Latin dictionaries disclose that *"tinea"* means ringworm or the like and *"cruris"* is the genetive case of the noun *"crus,"* meaning leg or shin. Thus, *tinea cruris* translates as ringworm of the groin for which the commonly recognized expression is "jock itch," doubtless due to association of the condition with an improperly fitted or inadequately washed jock strap. The medical texts show that it is a fungus condition.[7]

The resistance of the larger newspapers, including the New York Times, was gradually overcome. Next, magazines were taken on and the same resistance was encountered and eventually overcome.

The witness Gale was familiar with this history because he first began selling CRUEX in the market tests of 1966 and recalls that resort to euphemisms such as "groin irritation" had to be used if ads were to be placed.

Other approaches were to say "If you're too old to have diaper rash it must be something else," implying the term "jock itch" even though that term could not be used. He places the time of efforts with magazines as beginning in 1967–8. These

---

**6.** There was some argument that most of the period during which CRUEX was marketed should be ignored as evidence of association between the name and the condition of "jock itch". This was on the theory that except for the last 18 months, CRUEX was marketed as an aerosol spray. The argument lacks persuasion. Just as inclusion of hexachlorophene ended when its use as an anti-bacterial agent was banned, 21 CFR § 250.250, so the anticipation of a future ban on fluorocarbon aerosols does not imply a lack of association between the name, on the one hand, and the product and its application on the other. Diet drinks that used cyclamates hardly lost their "good will" associations between names and products when saccharine was substituted. These are changes caused by *force majeur*, in the nature of involuntary conversions over which the proprietor has no control. To take any other view would raise constitutional issues of a taking of property without compensation or due process, that should be avoided.

**7.** See references in footnote 3, above.

efforts evidently started with magazines for athletic directors and coaches who probably observed the condition more often than any other single group and are familiar with the term and the handling of the condition.[8]

The experience again was that the placements sought the most, i. e., in TV Guide, Readers Digest and the like, insisted on euphemisms instead of the bold headlines using the term "jock itch", for some time. And the indication is that this resistance was overcome in 1974–5.

Clearance to say "jock itch" in radio ads came in 1975, evidently on spot ads rather than network ads. A test was run for the New York Metropolitan area and in the course of one year the sales in that area doubled.

Radio ads were then taken and run throughout the country and national sales increased to 10% over the prior year which included the New York increase.

Also, in 1976 the first test ad was run on a single TV station in New Orleans, but full details of the experience were not adduced.[9]

The advertising agency for CRUEX, as well as for other Pharmacraft products, was Rumrill-Hoyt. David Popofsky worked there and with its predecessor from 1963–4 to April or May of 1971. Later that year he formed his own agency which now handles advertising for defendant's product.

The Court is satisfied from his testimony and other evidence in the case that he had good awareness of the CRUEX programs and its progress while with Rumrill-Hoyt and after he left there. He observed billboard usage in 1974–5. He heard radio ads in about the same period and was aware that such ads had been rejected while he was at Rumrill-Hoyt.

He knew that TV response was similar but saw a TV ad for another product with the term "jock itch" within the last year and a half or two. He thought it was in Atlanta on a local broadcast. The evidence also shows that Singer provided him with copies of his early ads in the New York Daily News.

Popofsky himself knew the term from when he was in the seventh or eighth grade in school and is aware of other kinds of advertising that are rejected on substantive grounds of various sorts including the subjective test of "not in good taste."

Discussion of the production of defendant's product started in December of 1975 when talk was had of turning out one or more items on a list of selected ones marketed by others. One of these was a "jock itch" item noted to be "a non-aerosol CRUEX." The name chosen for defendant's product, JOCKEX, was originated by Popofksy. He had recommended it to a company for which he handled advertising in which a brother of his owned an interest and suggested that it be listed in some trade reference books anticipating that it be used for a "jock itch" remedy.[10]

Later on he suggested the company sell the name, though not ever formally regis-

8. Mr. William Horey, a school athletics director, long-time coach and athlete, was called as an independent expert appointed by the court under Fed.Ev.Rule 706. Coaches were thought likely to be most familiar with the incidence of "jock itch" among sports participants, and the methods commonly used to deal with it. Coach Horey confirmed this, and also established that, despite the taboo against its use in print, the term has been long and widely known by word of mouth.

9. This history of media resistance was remarkably similar to that of Col. Elliot White Springs, President of Springs Mills, Inc., when he decided to enter the retail market with a series of ads for SPRINGMAID sheets and other products, largely based on the double entendre. His experiences are published in his book, "Clothes

Make the Man" (Copyright by Col. Springs in various editions to at least 1954), and were noted in various contemporary news articles and radio programs (i. e., Dorothy and Dick). That history was called to counsel's attention during trial, but the book was not received in evidence nor was judicial notice taken of it.

The witness Popofsky did testify to his awareness of other media taboos. At least one other witness also did. The court considered only this testimony and not the SPRINGMAID history.

10. Exhibit D–60 is a computer printout of various product names ending with the suffix "–EX". Among these, JOCKEX appears in two entries, indicating ownership by Brown-Vaughn Co., for "goods, not identified", one entry reflecting publication in the Drug Topics

tered so far as he knew, to defendant which proceeded to acquire it. Thus, the name JOCKEX was selected by defendant on the basis of Popofsky's recommendation. This occurred in early 1976. At that time it was evidently hoped that the product could be marketed for the summer of 1976, but that schedule was abandoned when it appeared that the earliest time to be expected was August, which is the end of the market season for this kind of item.

The schedule was changed to early 1977. The first ad evidently appeared in drug trade magazines about February 1977. There were no market tests despite the plan for national retailing.[11]

Popofsky also suggested the subhead "The name that sells itself" for the jacket

of promotional materials to be distributed by sales for defendant.[12]

The trade dress for JOCKEX adopts many features of the CRUEX trade dress. The squeeze bottle is white, the brand is black, the "O" of JOCKEX is colored like the circle part of the male symbol on the CRUEX bottle and carries within the circle an imprint in black "For Jock Itch Relief." Miscellaneous legends are in black, blue and orange; while the CRUEX colors are black, blue and red.[13] The phrasing of the legend is in many respects verbatim but with such changes as shifting sentence 1 of a legend to make it the last sentence of the legend.

The main visual differences are that JOCKEX and the statements of directions,

Blue Book and the other in the Drug Topics Red Book, which are trade directories.

11. The witness Mark Logan, who had supervised the 1966 market tests for CRUEX and explained their primary purpose, confirmed that there were no market tests for JOCKEX despite the fact that marketing was planned nationwide.

12. This slogan, aimed at wholesale and retail merchandisers to encourage their handling and "pushing" the product, indicates that Popofsky regarded JOCKEX, at least visually and more strongly orally, as very close to "jock itch", a term in the public domain. This makes the name more descriptive than fanciful. It also is a source for confusion, since a customer asking about "something for jock itch" could be understood to be asking for JOCKEX.

13. Color is a sensation involving complex processes in the human eye and brain. Visual identification depends on many factors, such as the composition of the light falling on the object, and the juxtaposition or not of the objects. Colors may be "additive" or "subtractive". When separate beams of light are superimposed on one target (or fluoresced as separate, tiny dots on a TV screen), the additive primary colors are red, green and blue. When pigments are mixed, as for paints and inks, the subtractive colors are magenta, yellow and cyan. White and black are also used to affect value (brightness) and chroma (saturation).

Exhibit C–8, the color strips and patches of the ink maker whose product is used to print both the CRUEX and JOCKEX containers, show that the CRUEX "red" (Pantone 185) and the JOCKEX "orange" (Pantone 165) are only 3 steps apart in hue and both have the same value (brightness) and chroma (saturation).

Neither one is a pure red or a pure orange in the sense of the colors of the spectrum. The CRUEX red is made up of 12 parts of Pantone "warm red", which has a yellowish cast, and 4 parts of Pantone "rubine red", which has a slight purplish cast. The JOCKEX orange is 8 parts Pantone warm red and 8 parts Pantone yellow.

The "process colors", which are process yellow, magenta, cyan and black, are basic subtractive colors for multi-plate printing reproduction, and the strips do not indicate that these colors are generally mixed for other purposes.

The basic colors used for mixing to get various shades of hue value and chroma are yellow, warm red, rubine red, rhodamine red, purple, reflex blue, process blue and green. In this array, "warm red" is distinctly an orange color of deep saturation. None of them looks "red" compared against the primary color scheme.

When the object is to make something look "as different as possible", the easiest approach is to select complementary colors, not colors of the same family a few shades apart.

For useful background information on "additive colors" (separate beams of light integrated on one target as in color TV for which the primary colors are red, green and blue), and on "subtractive colors" (pigments viewed by reflection, for which the primary colors are magenta, yellow and cyan), see "Light and Vision" (Life Science Library, 1966), and "Color", (Encyclopedia Americana, 1957 Edition). The Munsell Color Tree is evidently the most widely used standard for identifying the hue, value and chroma of any color.

These fundamentals have been known since the publication of Newton's "Opticks", which was first printed in 1704.

cautions, ingredients and origin are displayed vertically while CRUEX displays them horizontally; and in the substitution of an orange color for a red color.

The bottles and caps are procured from the same suppliers and have the same appearance except for size. The JOCKEX bottles are somewhat larger and the caps are somewhat smaller.

Taken all in all, the Court finds that the names JOCKEX and CRUEX are confusingly similar and it also finds that taken as a whole the trade dress is confusingly similar. The Court does not judge this question as a close one. The evidence strongly supports plaintiff's position.

The applicable legal principles are neither novel nor of recent origin. While the reported cases are legion and in some respects seemingly inconsistent, the great mass reflect the same view that has often been expressed in cases involving fraud, namely, that the law will not attempt a fixed definition, out of concern that some ingenious person will find a way to defraud by some novel artifice that is outside the definition. The law of unfair competition is but a segment of the broader area of fraud. *See, Hilton v. Hilton*, 89 N.J.Eq. 149, 102 A. 16 (Ch.1917), at page 154, where the court said, "Unfair competition is fraudulent conduct." Each case must, therefore, be decided on its own facts.

The interest to be protected in such cases is good will achieved by labor and expense even when the risk of loss arises without any actual competition at all. *See Vogue Co. v. Thompson-Hudson Co.*, 300 F. 509 (CA 6, 1924), involving a magazine publisher and a hat manufacturer, and *American Philatelic Soc. v. Claibourne*, 3 Cal.2d 689, 46 P.2d 135 (1935). Reasonable expectations for the future arising out of past achievements and trends are entitled to protection. *Yale Electric Corp. v. Robertson*, 26 F.2d 972 (CA 2, 1928).

The acts to be protected against are those which are fraudulent, whether intentionally or innocently, which are uncalled for, and the prohibition of which will have little or no effect on the wrongdoer. *See, Interna-tional News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), where the Court said at page 235, 39 S.Ct. at page 71: "Each party is under a duty so to conduct its own business as not unnecessarily or unfairly to injure that of the other."

As long ago as 1910 the principle was expressed in *Florence Mfg. Co. v. J. C. Dowd & Co.*, 178 F. 73, at 75 (CA–2, 1910): "It is so easy for the honest businessman who wishes to sell his goods upon their merits to select from the entire material universe which is before him symbols, marks and coverings which by no possibility can cause confusion between his goods and those of his competitors, that the courts look with suspicion upon one who, in dressing the goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." See also, *Jersey City Printing Co. v. Cassidy*, 63 N.J.Eq. 759, 53 A. 230 (Ch.1912) where Vice-Chancellor Stevenson said: "A large part of what is most valuable in modern life seems to depend more or less directly upon 'probable expectancies'. When they fail, civilization as at present organized may go down. As social and industrial life develops and grows more complex, these 'probable expectancies' are bound to increase. It would seem to be inevitable that courts of law, as our system of jurisprudence is evolved to meeting the growing wants of an increasingly complex social order, will discover, define, and protect from undue interference more of these 'probable expectancies.'"

To the same effect as the view expressed in *Florence Manufacturing* is the case of *Guggenheim v. Cantrell & Cochrane, Ltd.*, 10 F.2d 895 (CA–DC, 1926) where the court observed: "In this court it has been repeatedly declared that there is neither legal nor moral excuse for even an approximate simulation of a well-known mark applied to goods of the same descriptive properties, and that when an attempt to effect such simulation becomes apparent, the two marks should not be examined with a microscope to detect minute differences, but on the contrary, should be viewed as a

whole as the general public would view them; in other words, that the points of similarity are of greater importance than the points of difference."[14]

Also, as observed in *Eureka Fire Hose Co. v. Eureka Rubber Mfg. Co.*, 69 N.J.Eq. 159, 60 A. 561 (Ch.1905) dealing with cases where the name involved is descriptive, personal or geographic: "In such cases, proof of other facts than the mere choice of a name may be necessary to justify either the presumption or conclusion that the use of the name by defendant is for the purpose of representing his goods to be the goods of the complainant, and therefore unfair competition. * * *

"In the class of cases involving the purely arbitrary selection of a name, the selection of an arbitrary name to which another has given a trade reputation or value, in connection with the very class of goods defendant intends to put on the market, under a name containing the arbitrary or trade name, would seem to be ordinarily, of itself, sufficient proof of unfair competition, without further proof of fraudulent intent."

Here, CRUEX is an arbitrary fanciful name. Though constructed from the Latin term for "jock itch" and its elimination, defendant has chosen a name that is largely descriptive and equivalent in sight and sound to the term "jock itch" itself. It is more descriptive than it is arbitrary or fanciful. Yet it closely resembles the mark CRUEX particularly in conjunction with the condition "jock itch."

*Federal Trade Commission v. Standard Education Society*, 302 U.S. 112, at 116, 58 S.Ct. 113, at 695, 82 L.Ed. 141 (1937) is also instructive. In that case the Court of Appeals in the Second Circuit, 86 F.2d 692, in an opinion by Judge Learned Hand had said: "We cannot take seriously the suggestion that a man who is buying a set of books and a ten percent 'extension service' will be fatuous enough to be misled by the mere statement that the first are given away and that he is paying only for the second . . . Such trivial niceties are too impalpable for practical affairs, they are will-o-the-wisps which divert attention from substantial evils."

The Supreme Court reversed and in respect to that passage in the opinion below made the following comment: "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious. The best elements of business have long since decided that honesty should govern competitive enterprises and that the rule of *caveat emptor* should not be relied upon to reward fraud and deception."

14. In weighing the significance of trade dress similarity, attention must be given to functional aspects. Thus, in *Vaughn etc. v. G. G. Green, etc.*, 202 F.2d 172 (CA–3, 1953), the competing products were can openers, and necessarily looked like can openers. *General Radio Co. v. Superior Electric*, 321 F.2d 857 (CA–3, 1963) involved autotransformers. Since transformers consist of coils of wire wound on cores or armatures, they are typically enclosed in rectangular metal cans with rounded edges, and nameplates are necessarily relied on to identify source.

One of the clearest expressions of this point is found in *Lapointe Machine Tool Co. v. J. N. Lapointe Co.*, 115 Me. 472, 99 A. 348 (1916), where the court said:

"It must not be overlooked that in the manufacture of a machine the maker is limited as to general form and design by the very nature of the article itself. It must be adapted to a particular kind of work, and hence must assume the form calculated to perform that work best. No intention to imitate should be inferred therefrom. It is quite different from the wide option left open to the manufacturer of commodities which are designated by labels, or wrappers, or form of package. Here, there is no excuse for imitation, as in packages of chocolates, or velvet candy, or shoes".

Another case is *Harvey Hubbell, Inc. v. General Electric Co.*, 262 F. 155 (D–NY, 1919), where plaintiff's arrangement of blades and slots of electrical plugs and receptacles was adopted in an effort to standardize such devices, and was held functional and not infringed.

No such functional aspect appears here. Any geometric design, other than cylindrical, that is available for plastic squeeze bottles, would have served as well.

The Court has selected some of these older rulings to emphasize the element of good conscience and fair dealing and to indicate that if the courts were as concerned as they were so many years ago it can hardly be claimed that the standard of the marketplace has since declined. It is hoped that it has been raised.

Of course, *Q–Tips v. Johnson & Johnson*, 206 F.2d 144 (CA 3, 1953), as well as *McNeil Laboratories v. American Home Products*, 416 F.Supp. 804 (D.N.J.1976) are very much in point.

So, also, is an older case, *Cotex v. Oxtex*, 121 N.J.Eq. 377, 187 A. 750 (E & A, 1936), where there was unanimous affirmance on Vice-Chancellor Bigelow's opinion. He denied relief because the competing products, which were coated textiles or imitation leather for use in luggage, automobiles and other articles, were sold by the parties only to manufacturers and the marks on the artificial leather were either trimmed off or tucked under so that the retail customer who bought the finished articles never saw them; and he said, "The case would be different if sales to the ultimate consumer were involved." They are involved here.

In arriving at these rulings it should be made clear that they are supported without regard to the proofs offered of actual intent to confuse, that is, to deceive, or to injure. The effect is identical either way.[15] If the selection of the name or of the trade dress or both were wholly innocent and without knowledge of CRUEX, as some of Mr. Logan's testimony states, then when the first trade publication ad appeared and Pennwalt promptly protested, the defendant was put on notice and proceeded thereafter at its own risk.

A punch below the belt, to the groin, so to speak, is a foul even if not intended. And if repeated after warning, little justifi-

cation can be seen. It may be that the self-restraints of the advertising world are too weak. The brief account of Popofsky's major role in this unfortunate controversy makes this clear. He said he expressed the view that the name, trade dress or both for the new product should be as different as possible from CRUEX. His handiwork indicates that he does not understand the ordinary meaning of the term "as different as possible" and defendant is unfortunately saddled with his myopic vision.

During the trial the Court expressed the view that a reading of Popofsky's deposition gave the impression of a witness who was fencing with counsel and evasive. The Court asked that he testify so that he could be observed. Under questioning by the Court he was informative, responsive and forthright and the earlier impression was erased. Under questioning by counsel at trial the same behavior noted in the transcript reappeared, suggesting that the impression and the behavior were due to a mutual personality conflict. The Court does not question Mr. Popofsky's credibility.

At this point in the matter the Court will enter an order today for preliminary injunction to take effect today and to remain in effect until the form of permanent injunction can be settled. That order has been prepared. Pennwalt's prompt action has reduced defendant's risk and considerations of equity demand that the Court should continue along the same line.

The preliminary injunction contains provisions in the nature of a freeze but short of a recall. Information needed to deal with later steps is not in the record but it is called for. Waste and loss should be minimized and the Court should assist that effort. The order is so designed.[16]

The claims for accounting, damages and counsel fees are reserved for later consideration and may even be reserved in the final

---

**15.** The trend of development and refinement of tests in many fields is in the direction of objective, rather than subjective, measures. In the field of tax law, for example, "purpose" or "intent" has been replaced by "origin" and "nature". See *Woodward v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577

(1970); *Newark Morning Ledger v. U. S.*, 416 F.Supp. 689 (D.N.J., 1975), aff'd, 539 F.2d 929 (CA–3, 1976).

**16.** The provisions of the preliminary injunction calling for this additional information are as follows:

injunction. The Court's inclination is to seek to avoid added burdens on defendant for these items. This is not due to any doubts about the strength of plaintiff's case but is in recognition of the fact that early and successful action to halt the challenged conduct also implies that there may be little, if any, actual damage.

The term "jock itch" itself, of course, is wholly descriptive and the order recognizes that the defendant may use it, however prominently displayed.

The same is true of the BAUER & BLACK MEDICATED SPRAY POWDER for "jock itch" which the defendant acquired in mid-1976 and planned to phase out in favor of the JOCKEX line.

Finally, the Court finds the special defenses not proven. The evidence is to the contrary. This applies to the contention that CRUEX was not sold in commerce as early as claimed, to the issue about the elimination of hexachlorophene, and to the claim that the former product with hexachlorophene was sold in commerce after the date when the substance was barred. Plaintiff clearly made its last shipment before that date. If others later made im-

proper shipments they are not chargeable to Pennwalt.

"6. Defendant is directed to prepare, and submit to the court (with copy to plaintiff) as soon as feasible, a written report duly verified under oath, setting out the following information:

"A. The total cost and total quantity of any raw materials, semi-finished or finished product in its inventory for use as contents to be placed in containers whose use is enjoined by this order;

"B. The total cost and total quantity of all empty containers, not yet imprinted, in its inventory and intended for use in the activity restrained by this order;

"C. The total cost and total quantity of caps and spouts in its inventory, intended for use in the activity restrained by this order;

"D. The total cost and total quantity of all empty containers in its inventory, as described in B hereof, which have been imprinted;

"E. The total cost and total quantity of all finished products in its inventory comprising contents as described in A hereof, already placed into imprinted containers as described in D hereof and fitted with caps as described in C hereof;

"F. The total cost and total quantity of all printed literature of any kind, including but not limited to "blister cards" and counter display materials, in its inventory and intended for use in the activity restrained by this order;

"G. Information of the kind embraced by E and F hereof, for like items not in its inventory but delivered to others;

"H. Information to disclose what empty containers and caps, of the kind described in B and C hereof, are suitable for and can be salvaged and used for products of defendant, other than for the activity enjoined by this order, either now in production or planned for production within the next 8 months; including jock itch products not in violation of this order;

"I. Estimates of the cost of (and time required for) designing, preparing art work, and securing plates or similar devices for imprinting empty containers of the kind described in B hereof, in a form not in violation of this order, with a breakdown for the costs attributable to black imprint and to each color imprint;

"J. Any and all other costs, known or estimated, that will be incurred in the production and marketing of a product for the relief, alleviation, cure or prevention of jock itch (tinea cruris) that will not violate the provisions of this order."