HENRY ROMEIKE, INC., Respondent, *v.* ALBERT ROMEIKE & Co., INC., Appellant.

First Department, November 9, 1917.

**Injunction — unfair business competition — use by corporation of name of incorporator — when use of name will not be enjoined.**

Suit brought by " Henry Romeike, Inc.," a corporation, to restrain the defendant, " Albert Romeike & Co., Inc.," from using its corporate name or the name " Romeike " in connection with its corporate name or with its business. It appears that plaintiff and defendant are engaged in conducting press clipping bureaus in the city of New York at different locations, and that the plaintiff's business was originally begun by Henry Romeike who subsequently transferred the business and the good will thereof to the plaintiff corporation. It further appears that on the death of Henry Romeike certain of the corporate stock was distributed to his two sons, one of whom is the president of the plaintiff and the other is an officer of the defendant, which was subsequently incorporated. The defendant has never imitated any of the plaintiff's printed matter, but on the contrary the literature issued by it is entirely different in type, matter and arrangement. On all the evidence, *held*, insufficient to establish any dishonest use by the defendant of its corporate name, or any resort to artifice or deceit to mislead the public or to cause confusion as to the identity of the respective businesses of the plaintiff and the defendant, and that judgment dismissing the complaint should be directed.

The son of Romeike had the right not only to use his family name in his individual business but to have it used as part of the corporate name of the defendant of which he is a stockholder.

APPEAL by the defendant, Albert Romeike & Co., Inc., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 23d day of January, 1917, upon the decision of the court after a trial at the New York Special Term.

. The judgment restrained the defendant from using its corporate name or the name " Romeike " in connection with its corporate name or with its business.

*Henry Schoenherr,* for the appellant.

*Oscar W. Jeffrey* of counsel [*Harry D. Nims* with him on the brief], for the respondent.

Dowling, J.:

In 1884 Henry Romeike engaged in the business of conducting a press clipping bureau in the city of New York under his own name. He was not the pioneer in that field in this country, for one Shanks had previously engaged therein. He continued in that business in his own name until 1902, when the plaintiff corporation was organized as " Henry Romeike " on May 6, 1902, under the laws of the State of New York, to which, as the answer herein admits, Henry Romeike transferred " his press clipping business and the good will thereof." At first, and for a period of about six months, plaintiff did business as " Henry Romeike, Ltd.," until Romeike was informed that he had no right to use the word " Limited " as part of the corporate name, since which time plaintiff has advertised itself as " Henry Romeike, Inc.," though its proper corporate name was " Henry Romeike " simply. Henry Romeike died June 3, 1903, and his place as president of the plaintiff was taken by Albert Ruebe, who had then been with the business about fifteen years. George D. Romeike, son of Henry Romeike, became of age February 9, 1916. During his minority the business continued to be managed by Albert Ruebe, the president, who was in charge of its office work. Albert Romeike, a brother of Henry Romeike, was connected with the business all this time, and Albert's son, Charles, for a part of the period. Albert Ruebe was one of the trustees of Henry Romeike's estate, and after their accounts had been settled and the stock in the plaintiff corporation turned over to Henry Romeike's children, and as the result of differences with George D. Romeike, Ruebe resigned as president and left the employment of plaintiff on May 9, 1916. Albert Romeike (who had been a director, secretary and treasurer of plaintiff) and Charles Romeike (who had occupied a minor position with plaintiff) also left plaintiff's service some days earlier. George D. Romeike then became president of the plaintiff. In May, 1916, a corporation was organized under the laws of the State of New York under the name of " Albert Romeike & Co., Inc.," whereof the directors for the first year were Albert Romeike, Furman T. Howard and Edna J. Siess. This corporation was organized by Albert Romeike and Albert Ruebe, the former

being  treasurer, the latter president, and it engaged in the press clipping business.  Its offices were established at 33 Park place.  Plaintiff had never been in business in this vicinity, its offices having been in Twenty-second street, Union square, 110 Fifth avenue and finally at 106 Seventh avenue, where it is still located.  The judgment recovered herein perpetually enjoins the defendant, " its officers, directors, agents, servants, attorneys, employees, and all acting for, under, through, upon permission by or through it, or under any contract with it or authorization from it, be and hereby are perpetually enjoined from any use whatever of its corporate name . ' Albert Romeike & Co., Inc.,' or of the name ' Romeike ' as a part of its corporate name, or from any use whatever of the name ' Romeike ' in connection with the advertising of its press clipping business or the sale of its clippings or in the name of its press clipping business, or in any way or manner in connection therewith, and from carrying on its present press clipping business in any manner or form or by any methods or by the use of any name or act which may pass off it or its business or its clippings as and for the plaintiff, its business or its clippings, or from leading anyone in any way to believe that its business is the business founded by Henry Romeike."

It would be difficult to find a case of alleged unfair trade competition where the record is as barren of any evidence of fraud, false representation or unfairness as the one now under consideration.  The business conducted by both parties is unusual in its nature.  There are no trade secrets, no lists of customers, no goods manufactured to be sold to the public. All the competitors in this line used practically similar methods, some of which were adopted by plaintiff from another rival named Burrelle.  The newspapers are read by employees who clip therefrom the items affecting the persons or topics of which they are furnished with a list of the appropriate official.  These employees are mostly girls, who are paid one-fourth of a cent for each clipping they turn into the office. Outside of this business done on orders from customers, it is the custom of all those agencies to send out postal cards calling the attention of persons whose names appear in print to the fact that an item has appeared which is likely to prove of interest

to them, and volunteering to send the item for ten cents, and also in some cases quoting the rates for regular service. The business is largely a mail order one. Plaintiff employs about seventy people and has about 4,000 subscribers, forty per cent of its business being local, of which half is sent by mail, as well as all the sixty per cent which is out of town business. The defendant has never imitated any of plaintiff's printed matter. Its letter heads are entirely different from those of plaintiff in type, matter and arrangement. It has adopted a distinctive design, representing gnomes engaged in reading and clipping from newspapers, which differentiates these letter heads from those of plaintiff, and the same design appears on the printed matter most used by both concerns — the slips to which the clippings are attached — which in plaintiff's business are white in color, while those of defendant's are yellow. So also the subscription blanks used by both are strikingly different in color — white in the case of plaintiff, pink in the case of defendant, while the latter has its business address printed twice on the paper — in the heading and at the left-hand side, the latter in bold, large type, a deep black in color, which is the most striking feature of the announcement and attracts the attention at once. It is needless to say that no one could confuse 33 Park place, in a well-known down town district, with 106 Seventh avenue, which is between Sixteenth and Seventeenth streets. Nor is there any effort made to show confusion as to these two corporations, save by evidence which is either valueless, incompetent or suspicious. If the defendant had been guilty of using any unfair trade devices, it should have been easy to prove it, in view of the ingenuity resorted to in the effort to create evidence. Plaintiff caused three witnesses to be sent to defendant. The first, Marie Lane, says she sent a letter to " Romeike Press Clipping Bureau, 33 Park Place," asking about clippings. In response thereto a representative from Albert Romeike called upon her and told her there were two press clipping bureaus by the name of Romeike and asked her which one she wanted, when she guilelessly answered, " The original Romeike," to which he replied, " Well, there are two, Alfred Romeike and Romeike," and when she again said, " The original," he replied, " That must be the other

one." On cross-examination it appeared that she was a personal friend of George D. Romeike, and knew his business and his office address. Further cross-examination of the witness was abandoned on plaintiff's attorney conceding that the witness was not deceived, that George D. Romeike got her to send the letter, and she was not under any confusion or mistake about conditions. Robert V. Matthews, an attorney, swore that he called up the " Charles Romeike Company " on the telephone and asked that a representative be sent to see him about clippings for a client. The representative is claimed to have said that he represented the original Romeike concern. This witness on cross-examination developed into a friend of George D. Romeike of five years' standing, who claims that although George D. Romeike was his personal friend, and he knew he was in the press clipping business and that neither the father Henry Romeike nor the son George was connected with " Charles Romeike," he nevertheless called up the latter, to get it to do business for his alleged client. He insisted the name " Charles Romeike " was on the card which was handed him, which under continued cross-examination he identified as that of Albert Romeike & Co. When he was asked, " And you say that he said he was not the original Romeike? " the witness answered, " I can't answer that question, I do not understand it." He finally admitted that he believed the defendant was not the original Romeike before he telephoned for the visit of a representative. Even if this testimony had not been denied by Charles Romeike it would have been valueless. No such name as Charles Romeike & Co. appeared in the telephone book, and the witness after first swearing that he called up Charles Romeike & Co. after looking in the telephone book and finding that name there " or words to that effect," afterwards denied that he so testified. The remaining witness along the same lines is Edward J. Soltman, Jr., a college friend of George D. Romeike, who addressed a letter to " Romeike Press Clipping Bureau, 33 Park Place," in response to which a representative called who solicited his subscription, saying he represented a concern down town, not the one on Seventh avenue. He also thought the concern was " Charles Romeike." On cross-examination it sufficiently appeared that this witness also set

about endeavoring to procure evidence for plaintiff and he admits he knew the difference between the two concerns and was not deceived as to their identity.　There was also evidence of a letter written by Nelson McE. Sherman, a friend of George D. Romeike for ten years, who was given five dollars by the latter to write for clippings to the " Romeike Press Clipping Bureau," inclosing a check for that amount.　He received the clippings, knew whom he was writing to, was not deceived and acted throughout at the instigation and according to the instructions of George D. Romeike.　The same applies to the testimony of Montague Hanken.　Every one of these witnesses knew the real situation of affairs, acted at the instigation of George D. Romeike, and was neither misled nor deceived.　The other witnesses were Jennie Devlin, Catherine Vogel and Goldie Abramowitz, who testified that either Charles Romeike or Albert Romeike had offered them employment.　The first and third are paid by the clipping, the second by the week.　None of these witnesses left plaintiff's employment.　They simply cut items from the papers.　The witness Isidore Lefcowitz testified to hearing Albert Romeike and Celia Tischler talking together, after which the latter left, but came back again.　How long she was absent does not appear.　There were also offered in evidence numbers of envelopes which had come through the mail, nearly all of them after this action was commenced.　They have no reference to defendant, and at best would only be evidence of a confusion in the public mind as to plaintiff's own corporate name, due unavoidably to its own methods of advertising its business. They would not be proof of any confusion in the public mind as to the identity of plaintiff and defendant, for they all reached the plaintiff and according to its claim were all intended for it.　These names were varied and could as well be made arguments against any one whatever being allowed to use the words " Press Clipping Bureau " in describing their business, as against the defendant being allowed to use the name " Romeike " in any way in connection with its business. I do not believe these envelopes were properly received in evidence and that the original ruling of the trial court excluding those offered was correct.　There was no proof of their authenticity or of the circumstances under which they came

to be sent. The original inclosures were not produced. There was not even any proof that the envelopes contained inclosures of any kind. There is no evidence as to who sent them. To allow the receipt in evidence of a mass of practically anonymous declarations in favor of the plaintiff's contention in an action, concededly claimed to have been received after the action was begun, is to put a premium on the manufacture of favorable evidence with no possibility of either meeting it or of punishing any one for perjury or for an imposition upon the court. There is evidence that some eight or ten envelopes were readdressed to plaintiff by defendant, but how they were originally addressed does not appear, nor are the facts connected therewith shown.

The plaintiff's contention upon the record must be reduced to the bald claim that because Henry Romeike used his own name in his press clipping business for many years, and afterwards turned that business over to a corporation bearing his name, that no one else bearing the name Romeike can make use of it in that business. I do not believe that contention is sound. It has been stated that Henry Romeike did not originate the press clipping business in this country; that was done by one Shanks. Henry Romeike and plaintiff had competition in New York city in that business before defendant was organized. There is no single feature of the press clipping business which plaintiff, or its predecessor, is shown to have originated or improved. There was a firm of Romeike & Curtis engaged in the same business in London, the use of which name Henry Romeike unsuccessfully endeavored to enjoin. While plaintiff claims to have branches in London, Paris, Berlin, Sydney, Vienna and Rome, it has no branches in fact, but only correspondents there. It is true that an application was made by Ruebe and Romeike to secure a charter for the " Romeike Press Clipping Bureau, Inc.," but they are not sued herein for any use of that name nor does it appear that they have advertised or made use thereof in their business. In any event, that fact is not relevant to their use of the corporate title the use of which is enjoined by the judgment appealed from. Nor would even their intent to obtain part of plaintiff's business by competition under any other name be sufficient to constitute unfair trade, unless the intent was

effectuated by some overt act constituting fraud, misrepresentation or deceit. In *Material Men's Mercantile Assn. v. New York Material Men's Mercantile Assn., Inc.* (169 App. Div. 848) it was said: " Where one in the exercise of a natural right engages in a line of business in which another by the same name is conducting business, he is required so to regulate the use of his own name as not to confuse his business with that previously established, and manifestly courts of equity should, and do, intervene more freely where the question arises largely over the similarity of corporate names in which there was no necessity for the competitor to copy the name of the old company or to select one quite similar thereto." To the same effect are *Metropolitan Telephone & Telegraph Co.* v. *Metropolitan Telephone & Telegraph Co.* (156 App. Div. 583); *German-American Button Co.* v. *Heymsfeld, Inc.* (170 id. 416); *Celluloid Mfg. Co.* v. *Cellonite Mfg. Co.* (32 Fed. Rep. 94, 97); *British-American Tobacco Co.* v. *British-American Cigar Stores Co.* (211 id. 933, 935); *De Long* v. *De Long Hook & Eye Co.* (89 Hun, 403). But in this case not only is there no such confusion of businesses between the parties as would justify the intervention of a court of equity, not only is there no proof of unfair trade upon the part of defendant, but there is as well a sufficient dissimilarity of names to prevent any person of ordinary intelligence from being misled, and there has been proved the adoption of every reasonable means by defendant to distinguish its business from that of plaintiff. Albert Romeike was an incorporator of defendant and had a right not only to use his family name in his individual business, but to have it used as a part of the corporate name of a corporation in which he was a stockholder.

In *Singer Mfg. Co.* v. *June Mfg. Co.* (163 U. S. 169) it was said (at p. 187): " This fact is fully recognized by the well, settled doctrine which holds that although 'every one has the absolute right to use his own name honestly in his own business, even though he may thereby incidentally interfere with and injure the business of another having the same name. In such case the inconvenience or loss to which those having a common right are subjected is *damnum absque injuria.* But although he may thus use his name, he cannot resort to

any artifice or do any act calculated to mislead the public as to the identity of the business firm or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name.' " (See *Meneely* v. *Meneely*, 62 N. Y. 427; *Schinasi* v. *Schinasi*, 169 App. Div. 887; *Chapman* v. *Waterman Co.*, 176 id. 697; *Lapointe Machine Tool Co.* v. *J. N. Lapointe Co.*, 99 Atl. Rep. 348.)   In the case of *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict* (198 U. S. 118) it was held that a person had the same right to use his family name in a corporation, with which he is identified, as in a copartnership or individually, the court saying (at p. 136): " But if every man has the right to use his name reasonably and honestly, in every way, we cannot perceive any practical distinction between the use of the name in a firm and its use in a corporation.   It is dishonesty in the use that is condemned, whether in a partnership or corporate name and not the use itself."   And further (at p. 137): " It is said that the use of the word 'Remington' in the name 'Remington-Sholes' was unnecessary, as if necessity were the absolute test of the right to use. But a person is not obliged to abandon the use of his name or to unreasonably restrict it.   The question is whether his use is reasonable and honest, or is calculated to deceive.   'It is a question of evidence in each case whether there is false representation or not.' "   (*Burgess* v. *Burgess*, 3 De G., M. & G. 896.)

As I can find no evidence of any dishonest use by defendant of its corporate name, nor any resort to artifice or deceit to mislead the public or to cause confusion as to the identity of the respective businesses of plaintiff and defendant, I conclude that this judgment is wrong and should be reversed, with costs, and judgment entered in favor of the defendant dismissing the complaint of the plaintiff, with costs.

The following findings of fact as found by the trial court are reversed: 4 (strike out all after the words " conducted by him " and add " and the good will thereof "), 5, 7, 8, 9, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 34.

Also the following conclusions of law: 1, 2, 3, 4, 7, 8, 9, 10. The following findings of fact proposed by defendant are

found: 11, 12, 14, 16, 17, 18, 19, 20, 21, 22, 23, and the conclusion of law numbered 1.

CLARKE, P. J., LAUGHLIN and PAGE, JJ., concurred; SHEARN, J., concurred in result.

Judgment reversed, with costs, and judgment directed in favor of defendant dismissing the complaint, with costs. Order to be settled on notice.