STATE OF MAINE                          SUPERIOR COURT
HANCOCK, SS.                            CIVIL ACTION
                                        Docket No. CV-97-12
                                        JLH ~ HAN ~ 12/15/2003

FILED &
ENTERED

DEC 1 5 2003

SUPERIOR COURT
HANCOCK COUNTY

The Knowles Company,
        Plaintiff


        v.                              Decision and Judgment

                                        DONALD L. GARBRECHT
                                            LAW LIBRARY

Northeast Harbor Insurers,
        Defendant

                                            JAN 14 2004


        Following remand from the Law Court, the retrial of this case was held on April

23 and 24, 2003. On both trial dates, representatives of the parties were present with

counsel of record. Following the trial, counsel filed written summations and replies that

the court has considered. The essence of the plaintiff's claims is that, to the exclusion of

the defendant, it has title to and the right to use the name, "Knowles." From this

argument arise various causes of action based on allegations that the defendant has

misappropriated and otherwise improperly used that trade name. The plaintiff seeks

injunctive relief and money damages.

        In the late nineteenth century, Belle Smallidge Knowles, a local librarian, founded

a business on Mount Desert Island that specialized in developing and marketing rental

properties in the area. The business evolved to include and then focus on the sale of real

estate, on real estate appraisals and on insurance. The insurance aspect of the business

had developed by the 1930's. The company was called, "The Knowles Company," and

the building housing the business came to be known as the "Knowles Building." Several

generations of Belle's family were centrally involved in the business. In 1949, it was

incorporated under the name, "The Knowles Company." Belle's granddaughter,

Katherine, married Robert Suminsby in 1957, and Robert became affiliated with the

business within a year of their marriage. By the 1970's, the Suminsbys owned the

business as shareholders, and Robert served as its manager. The location of the business

has not changed since its inception in 1898.

1

By 1987, one Jack Wright had become a shareholder of The Knowles Company. The relationship between Suminsby and Wright, however, had become difficult, and in late 1987, they decided to part ways. That separation was embodied in an agreement that they reached in 1987 and that became effective in January 1988. *See* defendant's exhibit 24.[1] In its substance, Wright and The Knowles Company purchased Suminsby's shares of The Knowles Company. Wright ended up with the insurance component of the business and initially operated it under the name, "The Knowles Company," *see id.*, ¶ 7, and Suminsby retained the real estate and appraisal arms. They entered into covenants not to compete with the other's area of practice. *Id.*, ¶ 9. Thus, Suminsby agreed not to engage in an insurance business. Both Suminsby and Wright reserved the right to use the name, "Knowles," and the associated logo in their separate businesses. *Id.*, ¶ 6. However, the corporate entity and Wright both agreed "to change the corporate name of the Company from its present name 'The Knowles Company', to some other corporate name" within one year following the execution of the agreement. *Id.*, ¶ 7. This was accomplished, and the new corporate name was "The Knowles Corporation." *See* Suminsby deposition exhibit 13 (part of plaintiff's trial exhibit 1) at ¶ 4(a); defendant's exhibit 1.

Suminsby, Wright and the corporation entered into another agreement in May 1989. Pursuant to that agreement, Wright and the corporation agreed that, no later than October 1, 1990, the corporate name would be changed again, this time to "The Knowles-Wright Company," and they also agreed that "the word 'Knowles' will not be used by Wright or the Corporation without the use of the word 'Wright' in conjunction therewith." *See* Suminsby deposition exhibit 13 (part of plaintiff's trial exhibit 1) at ¶ 4(c). Further, under the agreement, by October 1, 1992, the corporation's name would be changed so eliminate the inclusion of the word, "Knowles," altogether. This progression in the degree of separation between Suminsby and Wright resulted, at least in part, from Suminsby's dissatisfaction with Wright's business practices. As part of this, Suminsby was unhappy that those practices would reflect badly on the Knowles name, and the

---

[1] The history of the transactions between Suminsby and Wright is also set out in a preamble to an agreement they executed in May 1989. *See* Suminsby deposition exhibit 13 (part of plaintiff's trial exhibit 1).

portion of the agreement noted here was designed to prevent Wright from carrying on under the Knowles name.

By 1992, Wright's insurance business was failing, and he sold at least some of the corporate assets, including the "book of business" (essentially, the client accounts), to David Granston and Eric Swanson. It appears that the corporate entity itself, The Knowles Corporation, became defunct. Granston and Swanson incorporated their new business under the corporate name, "Northeast Harbor Insurers" (NHI) and registered the trade name, "The Knowles Company Insurance," with the Maine Secretary of State. *See* defendant's exhibit 2. From the outset, NHI operated as "The Knowles Company Insurance." Its business was located in the Knowles real estate building, pursuant to the lease noted below. (The insurance business operated downstairs, and the real estate business was upstairs.) Indeed, after Wright's business failed, Swanson and Granston felt a successor business' best chance to survive would be to return to the Knowles real estate office and use the Knowles name. Randy Merchant and Terry Pinkham, now the principals of the defendant, worked for the company at that time. Several years later, when Swanson left the business, Merchant acquired shares of the corporation.

Previously, Wright had relocated his insurance business to a different building than the one where he had worked in concert with Suminsby's real estate practice. When, however, NHI succeeded Wright's company, Suminsby entered into a lease agreement under which NHI would use a portion of the real estate office as its place of business. *See* plaintiff's exhibit 3A (same as Suminsby deposition exhibit 14 (part of plaintiff's trial exhibit 1)). Although the lease instrument is not signed, it reflects the parties' agreement. The lease agreement covered the period between January 1992 and January 1997. One provision of the writing relates to the use of the name, "Knowles." *See id.* at ¶ 17. That term authorized NHI, "[d]uring the term of this lease," to use both the name "The Knowles Company – Insurance" and the associated logo. The document also acknowledged that NHI had requested the right to purchase the right to use that name after the lease expired and that Suminsby agreed "to consider this request and to notify the Lessee of his acceptance by December 31, 1994." *Id.*

While the two businesses occupied the same building, the relationship between David Granston and Suminsby deteriorated. In December 1996, NHI moved its place of

business to a location roughly one-quarter mile from the building where it had leased space from Suminsby. Prior to the physical separation of the businesses, Suminsby and Granston were overheard engaging in loud arguments. During some of these arguments, Suminsby accused Granston of stealing the Knowles name. After the move, NHI continued to use the name, "Knowles," but it discontinued its use of the traditional logo. For the next year or so, Needham and Merchant continued to work for NHI (by this time, Merchant owned a minority of the corporation's shares of stock), but both left in 1997. Later in 1997, several insurance carriers whose coverage was sold through NHI approached Merchant and Needham in an effort to get NHI into new hands. As a result of this initiative, the two acquired all of NHI's corporate shares, and they presently own those shares equally. NHI continues to use the trade name, "The Knowles Company Insurance." On one occasion in 1997, the defendant advertised that it had provided "A Century of Professional Service." *See* plaintiff's exhibit 8.

In the meantime, Suminsby had ongoing conversations to sell the real estate agency to three of its employees, Maria Brown, Keating Pepper and Harriet Whittington. The three formed a corporation, T.K.C., as the buying entity. *See* defendant's exhibit 3. That transaction between Suminsby and T.K.C. was consummated in early 1994. Because the real estate venture was not incorporated, it consisted of a sale of property and Suminsby's rights to the business' name and logo. The nature of these latter rights is at the heart of this case. The vehicle for the transaction was a pair of bills of sale. Suminsby did not sign either of them, but they embody the terms of the parties' agreement. The first bill of sale covered the tangible personalty associated with the business. *See* defendant's exhibit 16. It contained a warranty of good title. The second bill of sale conveyed "all right, title and interest, if any, to the names 'The Knowles Company' and "Knowles Company – Real Estate' or any name similar thereto. . .together with all right, title and interest, if any, to the so-called 'Logos' depicted on Exhibits A and B attached hereto." *See* defendant's exhibit 17.[2] The transfer of these rights was not accompanied by a warranty of good title similar to the one found in the transfer of the personalty. Both Suminsby and the buyers' own attorney, *see* defendant's exhibit 26,

---

[2] The grant was subject to an exception for the name of the real estate appraisal business carried on by Suminsby's son, Jerome. His company is named, "Knowles Associates."

made clear to them that Suminsby was not willing to make any representation or guarantee regarding the nature and extent of his rights to the name and his corresponding ability to convey that name to them.

Within several weeks after it purchased the business assets from Suminsby, T.K.C. registered the name, "The Knowles Company," and the associated logo with the Secretary of State. *See* defendants exhibits 4 and 5. In 1994, the corporation's name was changed from "T.K.C." to "The Knowles Company." *See* defendant's exhibit 6. Later, in 1996, the corporation registered the name "Knowles" to cover both a real estate and insurance business. *See* defendant's exhibit 9.

In the late 1980's, Gary Cole was licensed to sell insurance and worked for Wright, when Wright operated his insurance agency under the Knowles name. Cole left Wright's employment in 1989 and became affiliated with another insurance firm in eastern Maine. After Wright and Suminsby parted ways, Suminsby approached Cole to inquire if Cole had any interest in setting up an insurance office in Suminsby's building. However, Granston and Swanson assumed that role beginning in 1992, and Cole again went his separate way. In 1997, after NHI left the premises of the real estate agency, Whittington (now a shareholder in the real estate business) contacted Cole to again see if he would be interested in setting up an insurance branch on premises, because the plaintiff wanted to maintain the presence of an insurance business that had an actual or apparent association with the real estate concern. In fact, Cole, who is well regarded, was interested. He and the plaintiff developed a plan under which Cole would sell insurance as a representative of the agency where he had been working but would sell those policies as part of the operations of the real estate office. Cole's specific role was to get the insurance arm underway, develop a market and provide a setting where an employee or other representative of the plaintiff (probably Pepper) would become licensed to sell insurance. In effect, Cole was to set up an office at the real estate agency's location to sell insurance, although the selling agency would not be the plaintiff. Over time, as the insurance program developed, it would be transferred to and subsumed by the plaintiff itself. This plan stalled out, however, when the present dispute arose. With uncertainty about whether NHI was entitled to operate its separate insurance business under the Knowles name, Cole and the plaintiff felt it prudent not to establish another insurance

5

business that would be part of the Knowles real estate office and would thus be associated with its name, which, of course, the defendant was also using in its insurance venture. Although the process to obtain a license can consume up to a year, none of the plaintiff's principals or employees has started that exercise due to the pendency of this case. The plaintiff's principals became aware in the spring of 1997 that there was a dispute regarding the use of the name "Knowles" in association with an insurance business, and the plaintiff commenced this action shortly thereafter.

After NHI relocated its business operations out of the real estate office, the plaintiff received a significant number of insurance-related telephone calls that were intended for the defendant. For extended periods of time, the plaintiff's receptionist maintained a log of this misdirected calls. *See* plaintiff's exhibits 6 and 6-A. Exhibit 6-A demonstrates that those calls continue to the present. The defendant, on the other hand, does not receive calls intended for the plaintiff and its real estate business. This is not surprising, however, because the defendant's business name includes the word, "insurance." The evidence reveals that mail addressed to one party sometimes is delivered to the other. The confusion over mail, however, does not seem to be as significant as that relating to telephone calls. The plaintiff's telephone number has some inherent value, because it includes an exchange that is part of phone numbers assigned prior to an increase in the quantity of listings; that exchange is connected to phone numbers that had been in existence for a long time. Thus, the plaintiff's telephone number reinforces the business' long history.

Up through the time Wright obtained the insurance aspect of the Knowles business in the 1980's, insurance had been a constant component of the real estate company. Suminsby's area of concentration and focus was real estate. However, insurance was a product that the business sold. The link between real estate and insurance is natural, because purchasers of real estate often need to buy insurance. If the real estate agency that coordinates a sale of property also sells insurance, the client does not need to turn elsewhere, and the realty company can generate and then retain the business. As Brown testified, the plaintiff's real estate business has not suffered from the absence of an insurance arm. However, it does not offer the full range of services that had been available prior to Wright's acquisition of the company's stock in 1987.

Ellsworth is the location of a real estate company named, "The Knowles Company – Real Estate." Although the Ellsworth business has its roots with the plaintiff (it was founded by a former employee of the plaintiff), it has no present connection to the Northeast Harbor outfit. However, the logos for the two businesses have some similarities. *See* defendant's exhibit 25. The two make referrals to each other, but they cover separate geographical areas that do not have any meaningful overlap.

The evidence also shows clearly that the name "Knowles" carries a strong reputation for integrity and good service. Suminsby was protective of the name because of that association. Because the Knowles real estate agency has existed for more than a century, the name also signifies its long, established tradition in the community. Indeed, Swanson developed an interest in succeeding Wright in the Knowles insurance business because he was attracted by the prospects of developing an affiliation with the name. The current owners of NHI place considerable value on the Knowles name. Part of that arises from the length of time they have used it. Another reason, however, is the strong heritage embodied in that name.

The first trial in this case resulted in a judgment for the defendant, based on the trial court's conclusion that Suminsby had abandoned any rights he may have had to the Knowles name, at least in the context its use by an insurance agency. *See The Knowles Company v. Northeast Harbor Insurers*, 2002 ME 6, ¶ 11, 788 A.2d 587, 589 (*Knowles*). On appeal, the Law Court concluded that this finding was clearly erroneous in the face of evidence that even after Suminsby sold the corporate stock of The Knowles Company to Wright, Suminsby continued to operate his real estate agency under the Knowles name; that Suminsby took subsequent steps to use the Knowles name exclusively as demonstrated by the terms of the 1989 agreement; and that NHI acknowledged Suminsby's rights to the name, as reflected in paragraph 17 of the 1992 lease agreement. *Id.*, ¶ 13, 788 A.2d at 590. NHI's registration of the name, "Knowles Company – Insurance" with the Maine Secretary of State is subordinate to the plaintiff's rights to the Knowles name if the names are "deceptively similar." 13-A M.R.S.A. § 307(6)(B). *Knowles*, 2002 ME 6, ¶ 14, 788 A.2d at 590. The Law Court concluded that Suminsby in fact "had prior common law rights to the name and thus NHI did not acquire any superseding rights when it registered with the Secretary of State." *Id.* Therefore, on

7

remand, the remaining question needing resolution is "whether NHI has infringed on those common law rights." *Id.* The focus of this inquiry must be "whether NHI attempted 'to palm off [its] own goods or products as the goods or products of another.'" *Id.*, quoting *Lapointe Machine Tool Co. v. J.N. Lapointe Co.*, 115 Me. 472, 478 (Me. 1916).

After this case was remanded to the Superior Court for further post-appeal proceedings, the defendant appears to have moved for entry of judgment based on the Law Court's opinion.[3] The court (Mead, J.) denied that motion and ordered that this case proceed to a *de novo* trial that would be guided by the Law Court's analysis. This order must be seen in light of the Law Court's examination of the facts and the predicate it established for post-appeal proceedings. To do otherwise would be to disregard the effect of the Law Court's mandate and the reasons for it. Thus, this court must proceed on the basis of the Law Court's conclusion that Suminsby had not abandoned his claim to the Knowles name, that he had acquired common law rights to the name and that Suminsby's common law rights were not superseded by NHI's registration of the name with the State. Clearly, judgment could not be entered on the basis of these conclusions, because there remains the outstanding issue that the Law Court instructed the trial court to address. However, the Court's mandate directed this court to conduct post-appeal proceedings "consistent with this opinion." If, for example, the claim of abandonment were viewed as unresolved and subject to factual determination now, then that adjudicatory process would not be "consistent" with the Law Court's opinion because that process would be predicated on a foundation that the Law Court has rejected as a matter of law. Thus, this court must proceed from the point where the Law Court left off.

The core of the plaintiff's various claims is that it has enforceable proprietary rights to the name "Knowles," at least to the extent that such rights preclude the defendant's business-related use of the same name in the circumstances of this case. A series of Law Court cases mostly from the early twentieth century provides historical insight into the type of claim asserted here by the plaintiff. In that line of cases, one of

---

[3] This issue is addressed in an order dated May 23, 2002. A formal motion does not appear in the file, and the notice of appeal filed by the plaintiff suggests that this order followed a conference of counsel that was not recorded.

which was noted by the Court in *Knowles*, a distinction was drawn between "technical trademark" cases and ones alleging unfair competition. Where a business name is protected by a patent or copyright, liability flowed from the mere imitation of that name. *See Hubbard v. Nisbet*, 159 Me. 406, 407 (Me. 1963); *W.R. Lynn Shoe Co. v. The Auburn-Lynn Shoe Co.*, 100 Me. 461, 477 (Me. 1905). On the other hand, under Maine's historical common law analysis, the nature of a claim for unfair competition, which arises when the claimant does not have formal trademark rights to a word or some other designation, is quite different. In the case at bar, the plaintiff does not have formal trademark rights, and so the existence and extent of its commercial claims against the defendant must touch on the historical principles underlying a claim for unfair competition. Although the plaintiff has framed its separate counts of the complaint in various ways, as is noted above, all of those claims ultimately are predicated on its rights to the name "Knowles" and corresponding restrictions on the defendant's rights to do so. Therefore, all of the plaintiff's claims must be channeled through the legal principles governing infringement claims that do not rest on the existence of a formal trademark.

In establishing the legal issue to be addressed on remand, the *Knowles* Court relied on the succinct formulation of a claim for unfair competition: ". . .the underlying element in all [claims for unfair competition] is that no person shall be permitted to palm off his own goods or products as the goods or products of another." *Lapointe Machine Tool Co. v. J.N. Lapointe Co.*, 115 Me. 472, 478 (Me. 1916), *quoted in Knowles*, 2002 ME 6, ¶ 14, 788 A.2d at 590. The *Lapointe* Court went on to explain the nature of a claim for unfair competition:

> The essence of the wrong consists in beguiling or attempting to beguile the purchasing public into buying the wares of the offender under the belief that they are purchasing the wares of a rival. The ground of the action is fraud. The prohibition is confined to cases where the wrongdoer has resorted to some sort of deception. The complaining party must prove such circumstances as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of. . . .
>
> The methods adopted to practice this deception are as varied as human ingenuity can devise. It may be. . .by assuming the same or practically the same name. . . .Such conduct, calculated to steal away the custom, good will and business established and maintained by another, works both a fraud upon the purchasing public and actionable injury upon the defenceless rival. . . .

> The converse is also true. If the defendant, although a sharp and vigorous competitor, so conducts his business as not to palm off his products as those of the plaintiff, the action fails. He has kept within his legal rights.

*Lapointe*, 115 Me. at 478 (internal punctuation and citation omitted). *See also W.R. Lynn Shoe*, 100 Me. at 473 ("Every person has a right to the honest use of his own name in his own business, but he will not be permitted by imitative and unfair devices to mislead the public in regard to the identity of the firm or corporation, or the goods manufactured by it.").

It was typical of early cases involving trademark infringement to require a showing of fraud. *See* RESTATEMENT OF THE LAW OF UNFAIR COMPETITION, § 20, cmt. c (1994) ("Restatement"). The Maine cases noted above certainly reflect this legal approach. However, over time, claims of trademark infringement have come to be seen less as actions for invasion of property interests and more as claims that raise issues of economics and market behavior. *Id.*, § 9, cmt. c. Indeed, the seeds of this approach can be seen in the Law Court's sensitivity, revealed as early as 1905, to the interests of consumers and the importance of protecting them from the confusion that results when an owner's trademark is imitated by another player in the marketplace. *W.R. Lynn Shoe*, 100 Me. at 471. Accordingly, a more economy- and market-based analysis focuses less on the intent of the defendant than on the effects of that party's conduct. Thus, as the Restatement notes, the more current approach reflects the interests of more than the plaintiff's: it accounts for the interests of the consumer, and it also considers "the right of other sellers to compete vigorously with the trademark owner in the marketplace." Restatement, § 9, cmt. c. On this basis, a claim for trademark infringement does not turn on the question of whether the defendant acted fraudulently. *Id.*, § 20, cmt. c ("Intent to deceive or confuse is not required for the imposition of liability" for unfair competition in the form of trademark infringement. Instead, "[t]he likelihood of confusion focuses on the consequences of the defendant's conduct, not on the defendant's motives."). Rather, the ultimate question is whether, when the plaintiff in fact has a protectable interest in a trademark (as the Law Court has established that the plaintiff does here), the conduct of another party causes a likelihood of confusion that the parties' businesses are connected

10

or associated, or that the goods or services offered by one have been produced, approved or sponsored by the other. Restatement, § 20(1). If there is such a likelihood of confusion, then the causative conduct should be enjoined (or generate some other remedy) because it compromises the interests of the plaintiff to be free from such unfair competition and because it exposes consumers to uncertainty about the source of goods or services. In other words, under the modern approach, the questions of liability and damages for trademark infringement center on the effects of the defendant's conduct rather than on the level of culpability giving rise to that conduct.[4] The court finds this analysis to be more persuasive than a narrow reading of the Law Court cases noted above. Not only does the law formulated in the Restatement capture the more modern thinking of the legal principles at issue in this case, but the Law Court itself has relied on the Restatement in *Knowles*.

The question raised by the "likelihood of confusion" is, confusion of what? For purposes of this case, the inquiry must be whether the defendant's use of the word "Knowles" in it tradename creates a probability of confusion that the defendant "is associated with or otherwise connected with the" plaintiff, or that the defendant's services "are produced, sponsored, certified, or approved by the" plaintiff. Restatement, §§ 20(1)(a), (b); *id.*, cmt. d ("The question in each case is whether the actor's [defendant's] use of the mark is likely to cause confusion regarding the association between the actor's goods, services, or business and the goods, services, or business of the owner of the mark."). Thus, "[I]f prospective purchasers falsely believe that the trademark owner is the source or sponsor of the merchandise, there is a likelihood of confusion. . . ." *Id.*, cmt. b. Such confusion is not precluded by the mere fact that the parties engage in different businesses or offer different types of services. *See*

---

[4] It should be noted, as is discussed below, that the presence or absence of bad faith has some evidentiary significance. For example, if a party infringes on another's trademark interests and does so with intent to cause confusion or to deceive, then such evidence may be used to support an inference that the universe of consumers is likely to be deceived by that conduct. Restatement, § 22(1). The basis for this inference is that, if the offending party intends to create confusion in the minds of the purchasers, then this result usually is achieved. *Id.*, cmt. c. However, fraudulent intent is not the ultimate question, but rather it is evidence that bears on the dispositive issue of whether the defendant's conduct gives rise to a likelihood of confusion regarding the source of the goods or services at issue.

11

Restatement, § 20, ills. 4, 5. An appearance that the mark's owner sponsors, approves or is otherwise affiliated with the other party may create such confusion.

In order to determine if the defendant's conduct creates a likelihood of confusion, the court must consider "all of the circumstances involved in the marketing of the respective goods and services or in the operation of the respective businesses." Restatement, § 21. As set out in the Restatement, one specific factor used to assess the risk of confusion is any difference between the nature of the services offered by the parties. *Id.*, § 21(e). Part of that inquiry requires consideration of whether the defendant's prospective customers "would expect a person in the position of the other [the owner of the trademark] to expand its marketing or sponsorship into the product, service, or business market of the actor [the defendant];. . . ." *Id.* Again, the focus of this inquiry is on the perception of potential consumers, because the ultimate question is whether the use of a trademark by an outfit that does not own that mark is likely to cause confusion among those consumers. That confusion may be likely "[i]f consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user. . . ." *Id.*, cmt. j. In other words, a business' marketing activities may constitute unfair competition and infringe on the interests of another party even if those parties are not in direct competition with each other, if consumers tend to associate the differing products with each other and therefore are likely to be confused about their source or about the existence of some association between those sources. *See also id.*, cmt. b (principles of unfair competition apply in instances of both competing and non-competing goods and services); 10 M.R.S.A. § 1212(2) (in an action brought under the Deceptive Trade Practices Act, a plaintiff is not required to prove that the parties are in direct competition with each other.) This concept marks an expansion from an earlier approach that protected designations "only on a narrow range of goods closely related to those of the prior user." Restatement, § 21, cmt. b.

It may be significant that, when the parties' businesses are not in direct competition with each other, the trademark owner need not harbor an actual intent to expand into the defendant's field in order for the owner to prevail on an infringement claim. Instead, the central question is whether consumers are likely to draw a connection

12

between the two firms. However, if the owner in fact intends to expand into the type of business carried out by the defendant, then that intent may bear on the question of relief. Restatement, § 21, cmt. j.

A trademark owner establishes a "likelihood of confusion" with proof that the defendant's use of its trademark "is likely to confuse a significant number of prospective purchasers." Restatement, § 20, cmt. g. This standard is elastic because if the defendant has a legitimate interest in using the owner's mark or something similar to it, then courts will require proof of a greater likelihood of confusion that otherwise would be needed. *Id.* This tolerance obtains, for example, if the trademark also happens to be or suggest the defendant's own name. *Id.*

A likelihood of confusion may be demonstrated by proof of actual confusion. When there is actual confusion among consumers, the reasonableness of that confusion is immaterial. Restatement, § 20, cmt. g; *id.*, § 21, cmt. b (". . .convincing evidence of substantial actual confusion is ordinarily decisive."). Further, evidence of actual confusion supports an inference of a more generalized level of confusion sufficient to establish this element of an unfair competition claim. *Id.*, § 23(1).

The court concludes that NHI's use of the name, "Knowles," creates a likelihood of confusion that the parties are affiliated or that NHI's products are produced or sponsored by the plaintiff. This conclusion results from several factual analyses.

The Knowles real estate business established a long-standing tradition of offering insurance products for sale. As of the time the insurance arm was segregated from the real estate arm as part of the transaction between Suminsby and Wright in the late 1980's, insurance had been part of the real estate business for more than fifty years. For a short period of time, Wright was authorized to carry on his insurance business under the Knowles name. However, in the early 1990's, Suminsby and Wright entered into an agreement under which Wright, in several increments, would separate himself and his insurance business from the Knowles name. Then, in 1992, NHI acquired rights to use the Knowles name. It had that right, however, only for the term of the five year lease, under which NHI carried out its insurance business in the Knowles real estate office building. In the lease agreement, NHI implicitly acknowledged the close association of the Knowles name with Suminsby's real estate operations, as evidenced by the recital of

its request to purchase the right to use the Knowles name in its insurance business subsequent to the expiration of the lease, and the written recognition that Suminsby would "consider" that request.

This history demonstrates that for all but several years over the course of a century, the plaintiff's predecessors in interest maintained control over the extent to which the Knowles name was affiliated with an insurance office. Neither Suminsby nor the plaintiff themselves have engaged in the insurance business since the separation of the real estate and insurance practices in the late 1980's. Nonetheless, even during this more recent period of time, Suminsby affirmatively maintained the historical association between his real estate business and an insurance office, and his efforts included an extension of the Knowles name to the latter.

Even apart from the actual connection that Suminsby specifically created between his real estate business and the availability of insurance products, the court finds from the evidence that more generally this is a natural and logical association, and it is one that a reasonable consumer would be expected to draw. As is noted above, it is common for a real estate agency to offer insurance products because real estate clients often need to buy insurance. Therefore, the present circumstances reveal the presence of a real estate agency and an insurance business, with offices located close to each other in a small town, using the same key name in their business identification, having a history of close association (and prior to 1987, consisting of a single business), and providing services that have a natural association and affinity. Consideration of these market factors and the surrounding circumstances persuades the court that prospective consumers of insurance products are likely to conclude that the parties are associated with or affiliated with each other or that the plaintiff produced, sponsored or approved of the defendant's insurance products.

It is important to note that when NHI began its operations in 1992 under the lease it executed with Suminsby, its specific goal was to take advantage of the respect and integrity generated by the Knowles name. Wright inflicted terminal damage to the insurance business he acquired from Suminsby, and NHI's founders concluded that the best way to nurture the growth of the successor company (NHI) was to use the Knowles name and draw on the good will that the real estate company had established. Therefore,

14

although this plan was not malicious in any way, the use of the Knowles name was a purposeful business strategy designed to create an impression that the insurance agency was affiliated with the real estate business, because the latter was a source of strength. NHI could have chosen to operate under any other name. However, it selected a name – with Suminsby's approval – that had no connection to any feature or person within the business itself. Rather, NHI's founders decided to use the Knowles name only because it would suggest the existence of a material connection to a company in which the community had faith. Under the provisions of the Restatement, upon proof of a party's use of another's trademark with an intent to cause confusion, a resulting likelihood of confusion will be inferred. Restatement, § 22(1). That is the case here. NHI sought to create an appearance that it was allied with the plaintiff, and it did so by using the central element of the real estate company's trade name. Regardless of the fact that it did so (at least for the term of the lease) with Suminsby's consent, NHI's goal was to blur the lines between the two separate entities. Indeed, in 1997 or so, subsequent to the expiration of the lease, NHI held itself out as a company offering a century's worth of experience. This was not true for NHI. However, it is a true statement of heritage of the real estate company. Although the defendant characterized this advertisement as a mistake, it can only have resulted from an intentional decision to identify itself in the public eye with a separate company, namely, the plaintiff. From this, the court infers that NHI's use of the Knowles name had its intended effect.

Finally, the evidence demonstrates that NHI's use of the Knowles name in fact has caused confusion in the marketplace. During the time the parties shared the same building, which was prior to the time NHI relocated its offices down the street, they apparently shared the same telephone number; roughly one-third of all incoming calls were for NHI. In 1997, when NHI relocated, the plaintiff still received a substantial number of phone calls intended for NHI. (When that happened, the plaintiff's receptionist would advise the caller that NHI was not affiliated with the plaintiff and then gave NHI's phone number to the caller.) In fact, the number of calls was comparable to the number of calls prior to the time NHI moved out of the Knowles realty building. For a time, the plaintiff kept a record of those calls. The plaintiff then stopped maintaining those records but then resumed that practice in January 2003. Those records, *see*

15

plaintiff's exhibits 6 and 6A, demonstrate that even six years after NHI moved out on its own, a significant number of people call the plaintiff, inquiring about insurance matters. The court treats this as probative evidence of confusion in the marketplace.

The defendant contends that the fact of these misplaced calls is not unexpected because the firms once shared the same phone number. However, two points undermine this argument. First, many of the calls appear to be from people who had no prior dealings with NHI and who thus should not have proceeded on the basis of obsolete information. The better explanation is simply that those people wanted to inquire about insurance products from the Knowles insurance firm and believed that it was the plaintiff that offered those products. Second, if the fact of these ongoing calls can be explained as the product of consumer habit, then one would also expect the number of those calls to diminish over time, as that group of prospective consumers gradually came to learn that in order to reach NHI, they needed to call a new number. Because this did not happen in a material way, the resulting inference is the same as is noted above: many consumers were confused about the identity of the business that sold insurance. This can be attributed only to the similarity in the parties' names.

This evidence also weakens the defendant's argument that NHI's abandonment of a logo similar to the plaintiff's is sufficient to eliminate any consumer confusion about the nature of the parties' relationship. For the reasons set out in this order, the court finds that the word "Knowles" is the source of confusion and that any differences in the parties' logos is not an effective antidote.

The defendant contends that the number of businesses that are named "Knowles" weakens any suggestions that the name is unique or that consumers face confusion about the source of goods and services. In particular, the defendant points to the real estate agency based in Ellsworth, which is named, "The Knowles Company – Real Estate." The Ellsworth entity is not affiliated with the plaintiff, although it was formed by a former employee of Robert Suminsby. Because, however, the plaintiff and the Ellsworth firm conduct their businesses in separate and mutually exclusive geographical areas, the court does not find that the Ellsworth business creates a likelihood of confusion that would defeat the plaintiff's claims against the defendant at bar. *See* Restatement, § 21(f) and cmt. 1 ("The use of another's designation in a geographic area outside the marketing

area of the prior user can cause confusion only if the designation already identifies the prior user *in that territory*." (Emphasis added.)). Beyond this, there is no evidence that any of the other Knowles businesses creates a risk of confusion that they are affiliated with the plaintiff, or that the plaintiff has endorsed or sponsored their products, or vice versa. This point is made by Brown's testimony, during cross-examination, that if a local boatyard were named "Knowles," the plaintiff would not contend that the boatyard engaged in unfair competition. In that hypothetical instance, the dissimilarity between the business' services and the absence of any logical association between the two would make it very difficult to argue that there was a danger of confusion.

The defendant also contends that in order to prevail on a claim of unfair competition, the plaintiff must demonstrate that the likelihood of confusion in the marketplace threatens the plaintiff's commercial interests. Although the Restatement's formulation of a claim for unfair competition does not impose this element of proof, the associated commentary makes reference to it. *Compare* Restatement, § 20 *with id.*, cmt. b. Even if the plaintiff must make such a showing here, it has done so. There is no evidence that NHI's principals or its current business practices are anything other than proper and competent (except for the improper use of the Knowles name). However, no one can predict the future, and NHI's use of the plaintiff's designation exposes the plaintiff to commercial harm if there is a change in NHI's ownership or way of doing business. In other words, confusion among consumers is an inherent threat to the plaintiff's commercial interests because the plaintiff has no control over the marketplace's perceptions of NHI.

Further, and more concretely, NHI's use of the Knowles name has restricted the plaintiff's ability to enter the insurance field. The court finds that the plaintiff in fact intends to create an insurance arm of the present real estate business. Aside from the brief period of time when Wright was physically separated from Suminsby's real estate concern, the real estate agency has always provided insurance products, either as a service integrated into the real estate business (such as the many years predating Wright) or as a separate entity which conducted its business on the real estate office's premises (such as the arrangement with NHI under the lease between 1992 and 1997). After Wright was no longer on the scene but before NHI began its operation on premises,

17

Suminsby engaged in serious discussions with Cole to set up an insurance office as part of the real estate business. Similarly, after NHI moved to its current location, the plaintiff made moves to accomplish the same objective. The court finds that the plaintiff suspended those plans when the present dispute arose. That forbearance was entirely reasonable, because if the plaintiff had moved ahead with its plans, the level of confusion and uncertainty would have been greater than it is now. As the defendant points out, none of the plaintiff's principals is licensed to sell insurance, and none has taken the required steps to obtain licensure. The court attributes this, however, to the pending dispute, and it does not signify any intention to refrain from entering the insurance field.

Finally, the defendant correctly notes that of the various forms of designations, the level of protection afforded to a personal name is less than with respect to other trademarks. *See* Restatement, § 21, cmt. i. However, as the *Lapointe* Court noted, "[t]he use of the name is not controlling. The manner in which it is used and the actual or probable effect are the vital questions. The gist of the action is not the employment of similar words, but the appropriation of the plaintiff's business." 115 Me. at 480. Further, when the name used by the defendant is not the defendant's own name but rather is a name that is derived from the prior user, then that designation is considered to be stronger than it might be under circumstances where a greater level of accommodation is warranted. In the present circumstances, the court finds the "Knowles" name to constitute a strong designation as between these parties.

For these reasons, the court concludes that the plaintiff has a proprietary interest in the name "Knowles" that the defendant is not permitted to infringe. Further, the court finds that the defendant has infringed the plaintiff's interest. The plaintiff has cast its case in a number of separate causes of action. Of those, the plaintiff's claim at least satisfies the elements of an action under the Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1211 *et seq.* In particular, the plaintiff has established that the defendant caused the likelihood of confusion regarding the source, sponsorship, approval or certification of goods or services, or that it caused the likelihood of confusion or of misunderstanding as to the affiliation, connection or association with the plaintiff. *See* 10 M.R.S.A. §§ 1212(1)(B), (C). The defense urged by NHI under section 1214(1)(A) is not available here, because the name assumed by NHI through the registration process with the

18

Secretary of State is deceptively similar to the name to which the plaintiff had prior common law rights. *See* 13-A M.R.S.A. § 307(6)(B); *see also Knowles*, 2002 ME 6, ¶ 14, 788 A.2d at 590. Thus, NHI's use of the assumed name "Knowles" is not in compliance with the registration law.

The plaintiff has not argued that any of the other claims would entitle it to relief that is not available under the Deceptive Trade Practices Act. Therefore, with a finding favorable to the plaintiff on that count, the court need not and does not address the other counts in the complaint.

This leads to the question of relief. The court concludes that the proper remedy is an injunction foreclosing the defendant from using the word "Knowles" in its business operation and conduct. The core of the defendant's actionable conduct is its wrongful use of that name. For the reasons set out above, the added word, "Insurance," has not prevented confusion in the marketplace. Thus, the court is satisfied that further efforts to distinguish the businesses, but still allowing the defendant to conduct its business under the Knowles name, will not be meaningful. Beyond that, because of the long history and tradition associated with the plaintiff, the court finds it equitable to allow it the sole right to preserve to itself the use of that name, in those circumstances where others' use of it interferes with consumers' understanding of the source of services that reasonably appear connected to the plaintiff.

In concluding that this is the proper remedy, the court has considered the defendant's evidence regarding the possible impact that this injunctive relief may create. The defendant, however, chose to expose itself to the possibility that its use of the name Knowles is wrongful and subject to injunctive relief. The plaintiff, on the other hand, exercised restraint and caution and, rather than asserting their right to use the name in support of any insurance initiative, promptly sought a prior legal determination of that right. In these circumstances where the defendant knowingly accepted the risk of an adverse decision, their conduct and its consequences cannot undermine the plaintiff's equitable remedy.

The plaintiff also seeks an award of money damages. In sole support of that claim, the plaintiff has presented testimonial evidence of the defendant's net profit between 1999 and 2002. The plaintiff argues that the defendant should be required to

19

disgorge these profits as compensation to the plaintiff. Although a claimant need not establish compensatory damages to a mathematical certainty, *see Lee v. Scotia Prince Cruises LTD*, 2003 ME 78, ¶ 21, 828 A.2d 210, 215-16, this evidence is simply too rough to determine the extent to which the defendant may have gained from the use of the plaintiff's designation. Thus, because the evidence does not allow that determination, the court does not address the question of whether such damages would be warranted if its magnitude had been established.[5]

Under the Deceptive Trade Practices Act, a successful claimant is entitled to attorney's fees only "in exceptional cases." Although the plaintiff at bar has established that the defendant violated the provisions of this statute, it has not proven – or even argued – that that violation was "exceptional," as measured against some unspecified standard. However, the evidence demonstrates here that the defendant "willfully engaged in a deceptive trade practice." As is discussed above, the defendant's conduct was not inadvertent or mistaken. Rather, the defendant purposefully used the Knowles name in order to benefit from the strong reputational standing developed by the plaintiff over decades of time, and it continued to do so after any consent extended by Suminsby had ended. The court views this as willful conduct. Accordingly, the plaintiff is entitled to recover its costs of court.

The entry shall be:

For the foregoing reasons, judgment is entered for the plaintiff. The defendant is permanently enjoined and prohibited from using the name, "Knowles," in any aspect of its business operations.

The plaintiff is awarded its costs of court.

---

[5] For example, the purpose of compensatory damages is to make the injured party whole and thus to counteract the wrongful conduct of the defendant. Here, however, the disgorgement theory assumes that the plaintiff would have reaped the financial gains enjoyed by the defendant, if the defendant had not wrongfully infringed on the plaintiff's designation. To establish liability, however, the plaintiff was not required to prove actual financial loss. (This is true even in a claim specifically arising from the Deceptive Trade Practices Act. *See* 10 M.R.S.A. § 1213.) Because the plaintiff is not in the insurance business and because it would have taken time to develop that area of practice, one could not assume that the plaintiff suffered a dollar-for-dollar loss relative to the defendant's gains.

Dated: December 12, 2003

_____
Justice, Maine Superior Court

**FILED &
ENTERED**

DEC 1 5 2003

**SUPERIOR COURT
HANCOCK COUNTY**